**MARCUS CARUSO**
708 Nevada Way
Boulder City, NV 89005
(702) 287-0513
emjaillc@gmail.com

✓ FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD
JUN 03 2025
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: AZ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **MARCUS CARUSO (pro se) PLAINTIFF,**<br><br>Plaintiff,<br><br>vs.<br><br>**MADISON ADVANCE LLC; HIGHLAND HILL CAPITAL LLC, ANDREW VERSACE, SCOTT FEDERICO, TRISTAN BLOOM, GLENN BEHRMAN; SIGNET CAPITAL GROUP LLC, AJ CHAIT;**<br><br>Defendants | Case No.: 2:25-cv-00888-JCM-MDC<br><br>**VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** |

# I. INTRODUCTION

This case involves a coordinated, enterprise-level scheme to financially exploit a small Nevada business and its owner. Disguised as Merchant Cash Advance ("MCA") providers, Defendants weaponized deceptive contracts, fraudulent funding tactics, fabricated debts, and coercive repayment demands to bleed the Plaintiff and dozens of other business owners into financial collapse.

What makes this case extraordinary is not just the illegality of the transactions, it's the malicious precision of their execution. Plaintiff is one of many business owners caught in this debt trap, but unlike most, he refused to be silenced, intimidated, or destroyed.

Defendants used daily and weekly collection tactics, forged phantom balances, and even manufactured the approval of a fake $140,000 "consolidation" loan that they never intended to fund, demanding fees for services never performed and coercing Plaintiff into signing new agreements under financial duress. Their conduct constitutes fraud, unjust enrichment, breach of contract, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity). Plaintiff is a resident of Nevada; Defendants operate from Florida, New Jersy, and other jurisdictions. The amount in controversy exceeds $75,000.

2. Venue is proper under 28 U.S.C. § 1391 because all of the events giving rise to these claims occurred within this District as well as all business assets, accounts

receivable, sales taxes and inventory reside in Nevada and Defendants solicited and directed conduct toward Plaintiff in this District.

## III. PARTIES

3. Plaintiff Marcus Caruso is an individual Nevada resident and the sole member, operator, and guarantor of a Nevada-based business known as Maxx's Food and Drink at the Oasis Boutique Motel (EMJAI, LLC), which is not separately appearing in this action, at this time. All economic injury described herein was personally incurred by Plaintiff as an individual guarantor and signatory on all loan agreements referenced.

4. Defendant Highland Hill Capital LLC ("HHC") is a merchant funding entity doing business nationwide with its office located in Pompano Beach, Florida. It engages in high-interest lending, deceptive funding practices, and the enforcement of illegal, unconscionable contracts through coercive litigation and ACH seizures.

5. Defendant Scott Federico is a co-owner of HHC and an active participant in its coordinated acts of fraud and civil RICO violations.

6. Defendant Andrew Versace is the other co-owner of HHC and, upon information and belief, the primary architect of a coordinated lending scheme that meets the definition of a civil racketeering enterprise under 18 U.S.C. § 1962(c).

7. Alongside co-defendant Federico, Versace has operated or directed multiple merchant cash advance (MCA) entities, functioning not as legitimate lenders, but as a network of litigation-driven debt extractors structured to induce merchant default and collect unlawful obligations under threat of court-imposed ruin. In addition to HHC Versace also operates Highland Hill Capital US LLC, MEDUSA Investments Inc, and Command Industries Inc, all located in the same office at 1100 Park Central Blvd S, Suite 1200, Pompano Beach, FL 33064.

8. These entities do not offer credit in any good faith sense. Rather, they engage in a system engineered for default by design, relying on overextended businesses, overlapping contracts, fraudulent "consolidation" offers, and the repeated use of "rescue" loans that worsen financial distress. The goal is not repayment, but liquidation: of revenue, assets, credit lines, and business goodwill.

9. Public records show that Defendant HHC has initiated over 375 lawsuits in New York courts in the past two years, the vast majority resulting in default judgments, often without service or meaningful notice. Their attorneys, most commonly Jacob & Israel Weinstein and David Kogel, have established what appears to be a mass-litigation infrastructure designed to secure expedited judgments, enforce UCC liens, and leverage courts as collection engines, not arbiters of fairness. HHC operates out of Florida from the office listed above but for litigation

purposes they pretend to have an office in New York, no such office exists other than a legal construct to litigate in their prized court.

10. This conduct is not merely aggressive; it is a weaponization of the justice system. Defendants' pattern, filing near-identical suits, exploiting forum selection clauses, avoiding reconciliation provisions, and triggering defaults with predatory intent, constitutes systemic abuse. Plaintiff does not come before this Court merely seeking relief from an overreaching contract; he comes asking the Court to examine whether this arrangement even deserves to wear the mask of legitimacy. This case is not about breach, it is about exposure. Plaintiff invites this Honorable Court to be the first to say what tens of thousands of business owners already know: this is not lending. This is organized destruction.

11. Defendant Tristan Bloom is an employee and agent of HHC and participated in the execution of the acts complained of herein, including direct communications with Plaintiff under fraudulent pretenses.

12. Defendant Glenn Behrman is also an employee of HHC and participated in coordination with other Defendants to inflict financial harm on Plaintiff.

13. Defendant Madison Advance LLC [1] ("Madison"), controlled by Chaim Wenger, along with his front man and enforcer "Alex" (who refused to provide his last name), is a similarly disguised MCA entity operating under the same structural and fraudulent principles as HHC. It acted in coordination with other Defendants, including through false consolidation loans and off-book funding demands.

14. Defendant Signet Capital Group LLC[2] ("SCG") is named solely due to the misuse of its bank accounts by Defendant Chait, who routed illegal Zelle payments demanded as "finder's fees" through SCG's infrastructure. While SCG itself does not appear to be engaged in deceptive practices, its systems were leveraged in this scheme.

15. Defendant AJ Chait, affiliated with multiple MCA entities including HHC, Madison, and SCG (that he claimed was his Company, Florida State Business records suggest otherwise) demanded a $12,500 off-book "finder's fee" as a condition for facilitating the $140,000 consolidation loan with HHC that never materialized. He is an alleged convicted felon with a history of racketeering, intimidation, extortion, and fraud.

---

[1] Madison has about 90 active lawsuits against their clients.

[2] This Company has 0 suits and appears honorable.

# IV. FACTUAL ALLEGATIONS

16. Plaintiff Marcus Caruso is a Nevada resident who has owned and operated Maxx's Food & Drink at the Oasis Boutique Motel, a local establishment, through his wholly owned company EMJAI LLC, for over 12 years. The business was built from the ground up, successfully employing locals and serving the Boulder City community and was working on an expansion plan. Defendants heard about his plans to expand and showed up unsolicited with all the right answers. Instead of real assistance to help with his expansion Defendants launched a coordinated campaign of financial sabotage disguised as legitimate lending.

17. Between December 2024 and March 2025, Plaintiff entered into a series of loan agreements structured as Merchant Cash Advances ("MCAs") that were fraudulently marketed, structurally predatory, and executed with no intention of fair dealing. These included agreements with Madison, HHC, and Chait, all of whom operated in concert. Additional initial lenders, Capybara Capital, Funding Metrics, EBF Holdings LLC, and Invictus Partners, are not named in this complaint, as they did not engage in the coordinated predatory scheme that unfolded thereafter.

18. The five lenders (pre HHC fraud) disbursed a combined total of $202,276.68 in what were falsely characterized as cash flow support loans. However, the

disbursement was a trap: every single agreement carried unconscionable repayment terms in the form of fixed daily or weekly Automated Clearing House (ACH) debits totaling **$10,403.72 per week**.

19. These scheduled withdrawals were:

- Monday: $1,906.67
- Tuesday: $2,164.05
- Wednesday: $2,343.00
- Thursday: $1,800.00
- Friday: $2,190.00

20. These debits drained Plaintiff's accounts taking more than 100% of gross revenue. The incoming revenue, couldn't replenish fast enough, the money Plaintiff received to do the expansion was used instead to cover its own repayment. Now at a constant risk of overdraft, payroll interruption, or tax delinquency. The agreements lacked legitimate reconciliation mechanisms, which Defendants represented existed but never honored. Plaintiff never once had a withdrawal paused, adjusted, or evaluated in response to business performance by Defendants.

21. Each lender referred Plaintiff to the next, often under the pretense of solving the crisis they had created. Defendant Chait acting as an employee of all named

companies and a co-conspirator, recommended follow-up "rescue" funding through his affiliated entities, EBF, Signet, Madison, and HHC while concealing the overlapping ownership and financial interests.

22. As a direct result, Plaintiff was thrust into a stacking arrangement designed to fail. The Defendants not only knew Plaintiff could not sustain $10,400+ in weekly withdrawals, they planned for it.

**A. The Fake approved $140,000 "Consolidation Loan" – HHC's Trap**

23. After Plaintiff made repeated complaints that the stacking arrangement was financially untenable, Defendant Chait presented a solution: Defendant HHC would extend a $140,000 consolidation loan, retire the prior debts, and give Plaintiff breathing room.

24. To secure the loan, Plaintiff was instructed by Chait to get a 5th MCA Loan from his other employer Madison, they had Plaintiff approved for $25,000.

Plaintiff had to do this loan to pay a $12,500 finder's fee, to Chait to be able to get the HHC consolidation loan. Chait knowing Plaintiff didn't have the money arranged to have it taken care of by Madison. Upon funding by Madison, Chait directed Plaintiff to initiate zelle payments, which Plaintiff did via two off-book Zelle transfers, both of which went to Signet Capital Group, a non-party Defendant

used as Chait's laundering mechanism. Chait represented this payment as mandatory and non-refundable. The payments were not disclosed in any formal loan documentation.

25. This act alone constituted wire fraud, fraudulent inducement, and unjust enrichment, and was orchestrated by an alleged convicted racketeer. Chait allegedly was previously convicted of fraud, racketeering, and intimidation in Florida in 2021, and is allegedly known to the Florida Attorney General's office and Fort Lauderdale Police Department.

26. Following funding from Madison, Plaintiff signed a loan agreement with HHC on March 20, 2025, which falsely stated that $141,102.75 would be disbursed immediately. No such disbursement occurred (see Exhibit 6, page 44).

27. The following day, Friday March 21, Plaintiff received just **$8,212.92**, less than 6% of the promised funds. They decided they were distributing the $141,102.75 in weekly distributions. Without notice or warning. That doesn't pay off the 5 loans, it only resulted in adding a 6th.

28. When Plaintiff contacted HHC, he was met with a disturbing exchange. One agent initially seemed surprised and concerned, then abruptly muted the call. After several minutes, he returned and assured Plaintiff that everything was "normal" and

"approved." The implication was clear: someone else overruled the objection behind the scenes.

29. Simultaneously, also on Friday, March 21, HHC took their very first payment withdrawing $1,169.00, this occurred within minutes of the $8,212.92 credit. The withdrawals began again the following Monday and continued daily, five days a week, totaling $5,845.00 per week, every week, nearly 75% of what they were depositing.

30. HHC's "rescue" loan, billed as consolidation, was instead a *revenue extraction scheme* that added another massive cash flow drain without retiring a single prior debt. In other words, Plaintiff's bleeding artery was treated with another blade. Somehow collecting for the purchase of future earnings that didn't exist. Plaintiff had no future earnings left to sell.

**<u>B. The Deliberate Default – Week 3 "Skip"</u>**

31. During the third week of the new "loan," HHC failed to deposit any scheduled disbursement. However, it continued daily collections of $1,169.00, adding insult to injury.

32. The result: no revenue added, but $5,845 was withdrawn, compounding the $10,403.72 in weekly debt service already hitting his account from the other lenders.

33. That week alone, Plaintiff was forced to withstand a total cash flow hit of $16,248.72, a catastrophic 70% increase in negative burn rate that had zero business justification.

34. HHC refused to provide any explanation, records, or rationale. The failure to fund, coupled with continued collections, was an intentional breach and an act of constructive sabotage.

**C. The "$31,000 Balance" and HHC's Post-Fraud Coercion Scheme**

35. Following the collapse of the third week's funding, Defendant HHC refused to disburse the weekly installment altogether. No payment was received for that third week, yet HHC still deducted $5,845.00 from Plaintiff's business account. The resulting $16,248.72 in withdrawals that week inflicted financial chaos, triggering overdrafts, bounced payroll, and cascading vendor defaults.

36. On the second day of the fourth week, HHC belatedly resumed funding by issuing the next scheduled installment. However, the skipped third payment was never funded, leaving Plaintiff in a significantly worsened position. When Plaintiff pressed HHC for answers, Defendant Tristan Bloom insisted that no payment had been skipped at all, falsely claiming it had merely been "delayed by two days." Plaintiff spent hours attempting to reconcile the math, only to be repeatedly gaslit, a

textbook social engineering tactic that HHC deploys to manipulate distressed merchants.

37. During week five, Plaintiff confronted HHC regarding the absurd structure of the deal and reiterated that the only reason he agreed to the original contract was the promise of a $141,102.75 lump-sum funding for the purpose of consolidating five prior MCA loans. HHC's failure to pay off those debts rendered the arrangement nonsensical: what future receivables could HHC possibly be purchasing if all future revenue was already claimed by other lenders?

38. Meanwhile, HHC maintained the illusion[3] that Plaintiff owed them the full purchase price for receivables that never existed. Their accounting included:

- $51,836.49 in claimed "purchased receivables" (4 weeks × $12,959.12);
- $9,471.68 in total net benefit received (much less than the damage caused by this con;
- $5,845.00 per week in ACH withdrawals ($1,169.00 per weekday), identical to what a full $140,000 loan would have cost;

---

[3] See graphic illustration, Exhibit 7

39. When Plaintiff insisted on canceling the agreement, Defendant Bloom informed him that he "still owed" $30,956, despite already having repaid over $23,380 of the $32,851 disbursed. This fabricated balance had no relation to any legitimate debt, it was based entirely on fictional receivables never transferred or earned.

40. Plaintiff was then presented not with a new agreement, but an ACH authorization form, demanding $399.00/day until the alleged $30,956 balance was paid in full, equivalent to over $103,000 per year in withdrawals. No new funds were offered. Plaintiff was told plainly: either he signed or HHC would "go after the $30,956 by any and all means necessary." This was not negotiation. It was coerced collection via fraud and duress.

41. Later, in a candid off-the-record call with another HHC employee, Plaintiff was given a breakdown that made the scam clear:

"Every week, we say we're buying $12,959.12 in receivables, but you only net $2,367.92. That's your drip. The rest? We claim it. That's how we create your $30,956 balance, even though the sales never existed. Your account shows you got a $141,000 loan, even though you only received $9,471.68."

"If you stop paying, which people always do once they realize the truth, in your case, we hit you with:

- $51,836.48 in unpaid receivables;
- - (24,577) collected daily's )
- $2,500 stop-payment penalty;
- $7,426.43 in underwriting fees;
- $200 UCC filing fee;
- Plus 40% in legal fees of inflated purchase amount in your instance $89,058.28;

That's $128,943.71, but it only looks like $37k in our forthcoming law suit plus the attorney fees which are awarded at 40%, read the fine print we get 40% attorney's fees regardless of actual cost and it's based on the Receivables Purchased Amount line 2 page 1 of the contract. We file immediately. You waived service, so you won't even know it happened. Default in 35-41 days."

This employee was afraid to put anything in writing for fear of retaliation both financial and physical. They did advise if they were to become subject to a subpoena that he would testify truthfully exposing their employers corruption.

42. HHC has done this before. Hundreds of times. The math isn't an accident, it's a trap. The "balance" was a manufactured number, untethered to value provided or debt incurred. Plaintiff never agreed to it, never received the lump sum, and never consented to be charged based on fictional future receivables.

43. HHC's justification, that one prior merchant allegedly failed to use a lump sum properly, and thus they no longer fund in full, until after you establish a payment history, which is also a lie, none of this was ever disclosed before contract execution. Instead, HHC relied on Plaintiff's reliance on the document's plain language, which promised a net advance of $141,102.75.

44. To date, no countersigned agreement has ever been produced by HHC. Plaintiff has downloaded the full DocuSign audit log showing only his signature. More than 60 days have passed since execution, and no executed counterpart has ever been returned.

45. On May 1, 2025, Defendant HHC filed a secret civil action against Plaintiff in Kings County Supreme Court, seeking a default judgment for $37,069.36 plus 40% attorney fees of the inflated purchase amount, totaling $89,058.11, over double the amount claimed owed to defendant. This amount includes alleged "future receivables" HHC never purchased and attorney fees from a contract HHC never

countersigned. (See **Exhibit 8, page 49**). The lawsuit was filed secretly and without service, as part of a deliberate scheme to extract a default judgment under New York's broken MCA docket system. This is consistent with HHC's standard litigation playbook: ambush default judgment in a forum that ignores fraud defenses and never questions the lack of countersignature.

46. This maneuver is not an isolated act, it is standard operating procedure. In HHC's 375+ current lawsuits in New York, there is record of them losing a motion for summary judgment about 1% of the time, even post-appellate rulings confirming that these MCA contracts are disguised, criminally usurious loans. Yet even after that ruling Defendants HHC and Madison are still being granted Summary Judgments based on "this is not a loan mantra", even though the appellate says it is.

47. What HHC claims to purchase "future receivables", did not exist. Plaintiff's prior MCA agreements were still active and had first-priority claims on all receivables. HHC knew this upfront as they were supposed to provide the money to pay them off. They have acquired no right of first collection, no receivable assignments, and no equity participation in the five prior contracts via contract. Their claimed "ownership" of Plaintiff's income was legal fiction. The quick filing on May 1st, 2025 shows that not only are they trying to commit legal larceny from Plaintiff,

but they are also trying to front run their fellow cartel members, the ones who brought HHC to the Plaintiff. No honor among crime syndicates.

48. Without owning the receivables and without funding the consolidation, HHC had no valid legal basis for any debt claim. Their real aim was never to consolidate, it was to trigger default, extract pretextual penalties, and secure judgment based on deception.

49. The deception orchestrated by HHC was not an isolated fraud, it was merely one flank of a larger criminal lending enterprise. Multiple affiliated entities, brokers, and shell companies operated together to execute what is best described as a financial racketeering network targeting small businesses already in distress.

**D. Madison Advance – The Disguised $23K "Holdover Loan" to Feed the Finder's Fee**

50. Prior to the HHC "consolidation," Plaintiff was introduced to defendant Madison by defendant Chait. Plaintiff wasn't interested in another MCA loan, he was seeking consolidation. Plaintiff wanted to consolidate the entire mess into a mortgage on his commercial property worth about a million just for the land. Defendant Chait insured Plaintiff that is what he is doing for Plaintiff. He stated he needed $12,500.00 to make it happen and knowing Plaintiff didn't have it he brought

Madison in who agreed to give plaintiff $25k (so plaintiff could give Chait the $12,500 he needed to make a said consolidation happen). Plaintiff would be left with the other half (in theory only) to have a little breathing room until this loan Chait was working to secure with HHC was completed.

51. Plaintiff was told Madison would provide a bridge loan of $25,000 to "hold him over" while the HHC deal was being finalized. Madison was merely facilitating the laundering of Chait's demanded kickback.

52. Madison disbursed $23,250.00 to Plaintiff after deducting a $1,750 "origination fee", for a stated repayment of $37,475. Buried in the paperwork was a 13% additional surcharge, proving this was not a purchase of future receivables, but a disguised loan with an effective APR well over 200%.

53. Immediately after receiving the funds, Chait was already blowing up Plaintiff's phone making sure he Zelle'd the $12,500 immediately. Chait was crazy acting talking fast and demanding it to be done now, right now, or the consolidation is going to fall apart. Defendant was instructed to send the zelle to Chait's Company SCG and started making further threats that if the full $12,500 wasn't sent before wire cutoff, the HHC deal would be off.

54. HHC and Madison shared the same communications channels, and Chait operated as the common employee between all companies. The Zelle receipts, which Plaintiff retained, now serve as direct evidence of wire fraud and collusion (see Exhibit 2, 3, & 16).

55. At no point was Plaintiff told this "finder's fee" was illegal. At no point was it disclosed in the contract. At no point did Madison or HHC attempt to stop the extortion, because they were all in on it.

**E. Third-Party Confirmation: Not Just Plaintiff**

56. The Law Offices of Kenneth Dramer P.C., a national defense firm specializing in Merchant Cash Advance abuse, explicitly names Madison Advance LLC as a recurring abuser. Their published statements confirm that: "Many of our clients were never served properly, never had reconciliation honored, and were defaulted and sued based on abusive loan structures disguised as cash advances."

57. The firm has successfully vacated judgments, removed UCC liens, and negotiated returns on illicit default payments, proving these tactics are systemic, not isolated.

58. Separately, Overdrive Magazine released a series of national reports in 2022–2023 confirming:

- Thousands of trucking companies and small businesses are trapped by MCA stacking scams;
- One victim had $64,000 withdrawn weekly across 6 MCA contracts
- Another had a $35,000 advance turn into $50,000 debt overnight'
- Multiple lenders threatened to spread false claims of pedophilia, destroy reputations, and threaten families if merchants failed to pay;

59. The FTC, the New York Attorney General, and the Florida Attorney General have all filed lawsuits against MCA entities using the same contracts, same reconciliation sham, and same threats Plaintiff experienced.

60. In its landmark case against Richmond Capital Group, the NY AG described these agreements as: "Unconscionable, fraudulent, and criminally usurious, designed not to finance businesses, but to destroy them."

61. The New York Appellate Division (3rd Dept.), in Crystal Springs Capital v. Big Thicket Coin, ruled these exact contract structures void as a matter of public policy, citing the "absolute repayment" clause and lack of reconciliation as proof these were loans, not receivable purchases.

**CONCLUSION OF FACTUAL ALLEGATIONS**

**62.** Plaintiff brings this action not just for himself, but as the first domino to fall in exposing an industry-wide RICO enterprise cloaked in legal terminology, paper contracts, and the weaponization of the civil justice system.

63. Defendants have used ACH software, ghost lenders, unlicensed brokers, alleged convicted felons, and false promises to extort over $154,000 from Plaintiff, and countless sums from victims nationwide.

64. This Court now becomes the first federal battlefield on which this syndicate is met with truth, not silence.

# V: CONTRACT AS CRIMINAL FRAMEWORK

## A. Overview: A Contract Engineered for Predation

65. Plaintiff respectfully submits that the Merchant Cash Advance (MCA) Agreement presented by Highland Hill Capital ("HHC"), and similarly utilized by co-defendants Madison Advance LLC and others, is not a commercial contract in the traditional or legal sense. It is, instead, a meticulously crafted **fraud delivery mechanism,** a one-sided, oppressive, and unconscionable instrument that functions

as a vehicle for mass exploitation, cloaked in legalese and engineered to avoid judicial scrutiny.

66. The MCA agreement does not reflect a negotiated business transaction between two parties of relatively equal footing. It reflects **ownership of one party over the other**, more akin to human servitude than commercial engagement, with obligations stacked exclusively against the merchant and protections reserved entirely for the so-called "buyer." Every critical clause is designed to disempower, bind, surveil, and ultimately strip the merchant of revenue, legal recourse, and dignity.

67. Plaintiff contends that these contracts, on their face, violates public policy, federal and state lending laws, and basic principles of contract law, and **should be declared void ab initio** as a matter of law.

**B. Key Provisions Demonstrating Fraudulent Structure**

*1. Absence of Mutuality – The Merchant Bears All Obligations*

While the rest of **Section V** highlights HHC's MCA contract as the clearest example, nearly identical provisions and abuses appear in the agreement provided by Defendant Madison. These agreements share the same structural design: absolute repayment, sham reconciliation clauses, coercive default mechanisms, and unconscionable terms that weaponize the civil process. These instruments operate as variations of the same fraudulent template.

68. The agreement is structured such that all obligations are imposed upon the Merchant, while the so-called Purchaser (HHC) carries no enforceable duties. HHC may cancel funding, delay payments, or "modify" performance at its discretion. The Merchant, on the other hand, is bound irrevocably and punitively, even where no funding is received in full or at all.

*2. Fraudulent Mischaracterization – It Is a Loan in Disguise*

69. Despite aggressive disclaimers claiming this is not a loan, the operative clauses prove otherwise:

- Fixed daily payments unrelated to actual revenue (Section 3);
- No viable reconciliation mechanism, a "sham clause" used solely to dodge usury regulation (Section 4);
- Interest effectively exceeding 300% APR, when calculated based on actual disbursements and payments due.

70. The Second Department of the New York Appellate Division and recent rulings by the FTC and NYAG confirm that such MCA contracts, with absolute repayment and no good-faith reconciliation, are functionally loans, and where the interest exceeds 25%, criminally usurious.

*3. Sham Reconciliation Clause – A Regulatory Workaround*

71. Section 4 purports to allow reconciliation, the adjustment of payments to reflect a true percentage of sales. In practice, this is:

- Hidden behind burdensome requirements;
- Never executed in good faith;
- Used as a fig leaf to mask the true loan structure.

72. Merchants who attempt to invoke this clause are stonewalled, as Plaintiff was, gaslit into believing no over-collection occurred, even when disbursements were skipped and withdrawals continued.

***4. Absolute Control and Irrevocable Power of Attorney***

73. Section 16 grants HHC an unfettered power of attorney to:

- Endorse checks in Plaintiff's name;
- Redirect payments;
- File legal actions;
- Access bank accounts at will;
- Seize assets directly via UCC filings or ACH overrides.

74. This is not financial risk mitigation. This is legal dominion, the kind exercised over collateral, not people.

***5. Coercive Remedies and Weaponized Default***

75. Sections 17 and 32 allow HHC to declare default under arbitrary or pretextual conditions:

- Changing a password;
- Missing a document upload;

- Stopping payment on an illegal debit.

76. Upon "default," all funds become immediately due, regardless of the amount actually disbursed. Collection begins without service (Section 46), without due process (Section 39), and <u>with attorney fees fixed at 40% of the inflated "Receivables Purchased Amount."</u>

## <u>C. Violations of Public Policy and Legal Doctrine</u>

### *1. Unconscionability*

77. The agreement is unconscionable both procedurally (no negotiation, adhesion format, deceptive presentation) and substantively (shockingly one-sided, with oppressive terms). There is no "win" scenario for the merchant, only survival or liquidation.

### *2. Violations of Due Process*

78. The contract:

- Waives service of process (Section 46);
- Waives right to jury trial (Section 38);
- Waives counterclaims (Section 39);
- Requires arbitration under biased, **<u>private forums</u>** with no meaningful appeal (Section 45).

79. This strips the merchant of every fundamental right. **<u>The Court is asked to hold that private parties cannot pre-negotiate the surrender of justice itself</u>**.

***3. Illegal Assignment and Secured Interest Claims***

80. HHC claims the right to assign the agreement unilaterally (Section 34), and file UCC liens with "negative pledge" provisions (Section 31) that would criminalize any attempt by Plaintiff to seek alternate funding, even emergency capital to save their business.

81. This turns the contract into a financial ankle bracelet, not a partnership.

**D. The Human Ownership Paradigm**

82. Finally, the structural design of the agreement, its irrevocability, its absence of merchant remedies, and its dominion-style language, suggests that HHC views the merchant not as a client, but as collateral with a pulse.

83. This model only makes logical sense if the merchant is treated as property. And in 2025, no Court should be asked to enforce a private contract that dehumanizes, defrauds, and liquidates Americans trying to keep their small business alive.

**PRAYER UNDER SECTION V**

Plaintiff respectfully requests this Court:

- Declare the HHC MCA agreement void as against public policy;
- Find that the agreement is a loan in disguise, subject to usury laws;
- Issue a declaration of unconscionability under federal, Nevada, Florida, New Jersey, and New York law.

- Enjoin Defendants from enforcing the agreement through any mechanism (state court, arbitration, ACH);
- Refer the contractual framework and business model to appropriate regulatory bodies for Criminal Investigation.

# VI. CAUSES OF ACTION

## COUNT I – FRAUDULENT MISREPRESENTATION (Against All Defendants)

84. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

85. Defendants, jointly and individually, made numerous knowingly false statements to Plaintiff, including but not limited to:

- That Plaintiff had been "approved" for a $140,000 disbursement to pay off all existing debt obligations;
- That said funding would be deposited in full upon execution of the HHC agreement;
- That the "finder's fee" to Defendant Chait was legal and necessary;
- That prior MCA contracts were normal industry practice;
- That default provisions were standard, non-punitive, and survivable;
- That reconciliation rights existed and would be honored;

- That no other fees or commissions would be added post-execution.

86. These misrepresentations were made with intent to deceive and induce Plaintiff's reliance, which they successfully achieved. The truth, concealed, was that:

- The $140,000 "loan" was never intended to be paid;
- The structure was designed to sabotage cash flow, not support it;
- Fees were off-book, extortionate, and criminal;
- The entire process was a coordinated effort to create default, not prevent it.

87. Plaintiff reasonably relied on these statements in deciding to sign funding agreements, transfer personal funds, and allow ACH withdrawals.

88. Defendants' conduct constitutes fraud under federal and state law, and Plaintiff seeks all damages caused thereby, including punitive damages.

## COUNT II – BREACH OF CONTRACT
## (Against HHC, Madison)

89. Plaintiff entered into multiple written funding agreements with Defendants HHC, and Madison.

90. These agreements were materially breached by Defendants in at least the following ways:

- Failing to fund the full amounts promised (e.g., only $32,851 of $140,000 disbursed by HHC);

- Taking daily or weekly payments despite non-performance (e.g., HHC withdrawing $5,845 weekly while not funding);
- Adding fees, commissions, and charges not disclosed in the contract, Madison's bridge loan for the purpose of laundering the $12,500 Chait kickback);
- Enforcing terms via ACH withdrawals after agreement was nullified or unexecuted.

91. Highland's agreement was never even countersigned, calling into question its enforceability entirely. The same applies to Madison, they don't sign purposely.

92. Plaintiff performed his obligations under these contracts or was prevented from doing so by Defendants' sabotage.

93. Plaintiff has suffered over **$150,000 in actual financial harm**, plus future projected losses from business interruption, reputational damage, and impaired credit.

## COUNT III – UNJUST ENRICHMENT
## (Against All Defendants)

94. Defendants, through deception and manipulation, retained funds from Plaintiff to which they had no legal or contractual entitlement.

95. These include:

- The $12,500 Zelle payment to AJ Chait, off-contract, unearned, and coerced;

- $24,976 in Highland ACH withdrawals on a fake loan;
- $5,845 deducted during a week where no disbursement occurred;
- A $31,000 "residual balance" based on no legitimate funding;
- Interest and surcharges exceeding 300% on Madison's "holdover" loan.

96. Defendants provided **no legitimate value** in exchange for these enrichments. They promised funding, debt relief, and consolidation, and delivered sabotage, fraud, and destruction.

97. It is **inequitable** for Defendants to retain these amounts. Plaintiff seeks full restitution, including disgorgement of profits earned by Defendants from unlawful conduct.

**COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS OPERATIONS**
**(Against All Defendants)**

98. Plaintiff operates a small but long-standing business in Boulder City, Nevada. His revenue streams, customer service reputation, and vendor relations depend on operational cash flow.

99. Defendants knowingly interfered with these operations by:

- Initiating daily ACH debits that crippled cash flow;
- Misrepresenting fund availability to prevent lawful alternatives;
- Defaulting Plaintiff in vendor and tax obligations;

- Forcing him into "replacement" MCAs under duress, accelerating the collapse;
- Sabotaging vendor relationships and risking liquor license suspension through bounced checks and missed payments.

100. This interference was intentional, malicious, and wholly preventable, it occurred because of the Defendants' deliberate acts, not market forces or business mismanagement.

101. Plaintiff seeks consequential damages for lost business value, lost customer goodwill, and reputational harm.

## COUNT V – CIVIL CONSPIRACY
**(Against All Defendants)**

102. Plaintiff realleges and incorporates all prior paragraphs of this Complaint.

103. The Defendants, including individual operators and affiliated companies, acted in concert to defraud, extort, and bankrupt Plaintiff through a scheme of predatory funding, deception, and coordinated financial sabotage.

104. This conspiracy included but was not limited to:

- Referring Plaintiff from one lender to the next in a stacked-debt circle;
- Sharing underwriting, banking, and ACH infrastructure;
- Constructing "rescue" loans that were never meant to rescue;
- Fabricating balances and payment terms after contract execution;

- Laundering illegal referral fees through SCG;
- Coordinating threats and leverage via shared staff, call centers, and email domains;
- Filing retaliatory lawsuits without service or notice to bleed Plaintiff legally;

105. The conspirators each knowingly contributed to the unlawful scheme and benefited from each other's acts, thus satisfying the elements of joint enterprise and civil conspiracy.

106. Plaintiff seeks joint and several liability for all damages, and treble damages where allowed.

**COUNT VI – COERCION AND ECONOMIC DURESS**
**(Against HHC, Chait, & Madison)**

107. Defendants used financial manipulation, withheld funds, and psychological pressure to force Plaintiff into signing agreements under threat of economic collapse.

108. Specifically:

- The HHC "consolidation" loan was promised as urgent relief. Instead, it was a time-locked trap where Plaintiff was told: "Sign this new addendum now or get nothing, and the other lenders will crush you over the weekend."
- Madison's bridge loan was contingent on paying a $12,500 "finder's fee", effectively a ransom payment disguised as funding, with threats the larger loan would not proceed otherwise.

- Plaintiff had no realistic alternative but to sign, under circumstances manufactured by Defendants themselves.

109. These contracts, executed under duress, are voidable and stand as evidence of coercion and abuse of power.

## COUNT VII – VIOLATION OF STATE USURY & LENDING LAWS (Against All Defendants)

110. The terms imposed by Defendants constitute criminally usurious loans disguised as "merchant cash advances."

111. Madison charged Plaintiff $23,250 to access $37,475 in "receivables," not including daily withdrawals that exceeded a 200%+ APR.

112. HHC's effective interest rate, subtracting $5,845 from a weekly $8,212.92 "distribution", amounted to over 400% annualized cost.

113. Defendants attempted to bypass Nevada lending caps (generally between 18%–25%) through deception.

114. These transactions qualify as unlawful under both state civil and criminal usury laws, entitling Plaintiff to damages, rescission, and restitution.

## COUNT VIII – DECLARATORY RELIEF – CONTRACTS UNENFORCEABLE AS AGAINST PUBLIC POLICY (Against HHC and Madison)

115. The contracts at issue are void and unenforceable under public policy doctrines.

116. For example, HHC's agreement includes:

- A ban on counterclaims;
- A jury waiver in all disputes;
- A clause forbidding class actions;
- A 40% penalty for "legal fees" even if Plaintiff prevails;
- No reciprocal rights for Plaintiff;
- Forced litigation in a State (New York) court which Defendants are not located in due to the favorable and often corrupt rulings granted in their favor without any merit and against recent appellate rulings;
- A "you owe us no matter what" clause even in bankruptcy.

117. These provisions are procedurally and substantively unconscionable, and their inclusion reflects a deliberate attempt to insulate predatory conduct from judicial scrutiny.

118. Plaintiff seeks a formal declaration that these contracts are void as contrary to the laws and public policy of Nevada and the United States.

**COUNT IX – RICO VIOLATIONS (18 U.S.C. § 1962(c) and (d))**
**(Against All Defendants)**

119. Defendants formed an "association-in-fact" enterprise whose common purpose was the extraction of unlawful debts via wire fraud, extortion, and coercion.

120. This enterprise included:

- **Highland Hill Capital** – front for fake "consolidation";
- **Andrew Versace, Scott Federico, and AJ Chait** brains of the RICO Syndicate;
- **Madison Advance** – issued bridge loan to cover illegal referral payment;
- **Signet Capital** Group – unknowingly became a laundering platform for Zelle kickbacks for Chait;
- **AJ Chait** – Alleged convicted racketeer initiating and collecting criminal proceeds;

121. Predicate acts under 18 U.S.C. § 1961 include:

- **Wire fraud** (use of Zelle, email, banking platforms to defraud);
- **Collection of unlawful debt** (exceeding usury limits; fabricated notes);
- **Extortion** (use of default threats and unlawful contracts to induce payment);

122. At least two predicate acts occurred within 10 years, with **dozens documented** in Plaintiff's exhibits and statements.

123. This conduct constitutes a violation of 18 U.S.C. § 1962(c) (conducting enterprise through racketeering) and § 1962(d) (conspiracy to do so).

124. Plaintiff seeks **treble damages**, full restitution, and **dissolution** or permanent injunction against the operation of this enterprise.

**COUNT X – ADHESION CONTRACT / UNCONSCIONABILITY**
**(Against HHC & Madison)**

125. Defendants presented Plaintiff with one-sided contracts:

- With no ability to negotiate;
- With undisclosed fees, retroactive terms, and unilateral control over performance;
- With **bizarre penalties and remedies** only favoring the Defendants / lender;
- And with threat of cancellation, retaliation, or business destruction for noncompliance.

126. These contracts were:

- **Procedurally unconscionable** (forced, no time to review, duress)
- **Substantively unconscionable** (predatory terms, asymmetrical enforcement, hidden fees)

127. Plaintiff seeks rescission and declaratory relief that these contracts cannot be enforced against him, his business, or his guarantees.

**COUNT XI – DECLARATORY RELIEF: NONEXISTENT OBLIGATIONS**

**(Against Highland Hill Capital & All Defendants as to Any Balance Claims)**

128. Plaintiff seeks a judicial declaration that:

- No balance of $37,069.36 is owed to HHS, as **no funding occurred** under enforceable contract terms;
- No residual debts are owed to any defendant, as all contracts were breached, illegal, or procured through fraud;

- All future collections or enforcement actions would be based on fraudulent foundations.

129. Defendants should be barred from asserting balances that have no legal basis, especially in foreign courts, by confession of judgment, or under fraudulent documents fabricated after the complaint filing.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marcus Caruso, standing not just for himself but for every small business crushed under the weight of deceit disguised as debt, respectfully asks that this Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following:

130. Compensatory Damages in an amount to be proven at trial, but not less than $154,615.27 in repayments, plus $12,500 in unlawful fees and any other losses suffered from Defendants' sabotage of Plaintiff's business and peace of mind;

131. Treble Damages pursuant to 18 U.S.C. § 1964(c) (RICO), for each predicate act of racketeering, including wire fraud, extortion, and unlawful collection activity;

132. Restitution of all monies taken via unauthorized ACH debits, fraudulent inducement, or unenforceable contract provisions;

133. Rescission of Contracts, declaring all agreements executed under coercion, fraud, or false pretenses null and void ab initio;

134. Plaintiff respectfully seeks an award of punitive damages in an amount sufficient to punish Defendants for their malicious, willful, and systematic exploitation of small businesses, and to serve as a powerful deterrent to others engaged in or contemplating similar unlawful conduct. In furtherance of the public interest and to support other victims of abusive Merchant Cash Advance practices, Plaintiff proposes that any punitive damages awarded be used to establish a "Small Business MCA Victim Relief Fund." The purpose of this fund will be to provide emergency financial assistance to small businesses at risk of immediate closure due to MCA-related predatory practices, and to cover legal costs for those unable to afford representation, thereby empowering victims to challenge unlawful contracts and practices.

Plaintiff requests that the administration of this fund be overseen either by this Honorable Court or by an independent third-party fiduciary, subject to the Court's review and approval, to ensure accountability and proper use of funds consistent with the purpose herein stated.

135. Injunctive Relief, preliminary and permanent, enjoining all Defendants and their agents from:

- Debiting Plaintiff's accounts;
- Contacting Plaintiff or his business in any form except through this Court;
- Filing or enforcing any future judgments or legal claims based on the contested agreements;
- Transferring, destroying, or altering any records or communications relevant to this matter;

136. Declaratory Judgment confirming that:

- All claimed debts are fraudulent or illegal;
- The Defendants' contracts are void for unconscionability, fraud, and public policy;
- No lawful balance remains due under any agreement referenced in this Complaint;
- Attorneys' Fees and Costs, should Plaintiff retain legal counsel under fee-shifting statutes or equitable principles;

137. Expedited Judicial Oversight and recommendation to federal investigative bodies, should the Court deem appropriate under its inherent supervisory authority and Rule 11(c)(3);

138. Any other relief this Honorable Court deems just, necessary, and in the public interest to restore order, accountability, and economic dignity to victims of this enterprise.

## VII. DEMAND FOR JURY TRIAL

139. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Executed this 3rd day of June, 2025 in Boulder City, Nevada.

Respectfully Submitted,

Marcus Caruso (Pro Se)

Marcus Caruso
Pro Se Plaintiff
emjaillc@gmail.com
702-287-0513
708 Nevada Way
Boulder City, NV 89005

**MARCUS CARUSO**
708 Nevada Way
Boulder City, NV 89005
(702) 287-0513
emjaillc@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

**MARCUS CARUSO (pro se)**
**PLAINTIFF,**

Plaintiff,

vs.

**MADISON ADVANCE LLC**, et al.,

Defendants

Case No.: 2:25-cv-00888-JCM-MDC

**EXHIBIT INDEX**

## EXHIBIT INDEX

**EXHIBIT 1 page 3**
Highland Hill Capital LLC Contract (unsigned by HHC; includes coercive clauses)

**EXHIBIT 2 page 30**
Zelle Payment Confirmation to "AJ" at Signet Capital (March 20, 2025)

**EXHIBIT 3 page 32**
Zelle Payment Confirmation to "AJ" at Signet Capital (March 21, 2025)

**EXHIBIT 4 page 34**
Wells Fargo ACH Disbursement and Repayment Logs (Madison Advance LLC)

**EXHIBIT 5 page 37**
Wells Fargo Daily ACH Debits (Highland Hill Capital LLC)

**EXHIBIT 6 page 44**
Wells Fargo Weekly ACH Credits (Highland Hill Capital LLC)

**EXHIBIT 7 page 47**
Graphic – The Illusion of Ownership in MCA Predation (Example of HHC Typical Flowchart)

**EXHIBIT 8 page 49**
Verified Complaint filed by Highland Hill Capital LLC in NY State Court (Index No. 514572/2025)

**EXHIBIT 9 page 56**
Verified Complaint filed by Madison Advance LLC in NY State Court (Index No. 515088/2025)

**EXHIBIT 10 page 67**
Affirmation of Service and Notice of Impending Default Judgment – Madison v. Caruso

**EXHIBIT 11 page 70**
DocuSign Stipulation of Settlement sent by Madison Advance LLC (unsigned by Plaintiff)

**EXHIBIT 12 page 75**
Text Message Screenshots from "Alex" at Madison Advance Pressuring Signature

**EXHIBIT 13 page 78**
Demonstrative Infographic Example: Pattern of Fraud, Coercion, and Judgment Abuse (RICO Framework Summary)

**EXHIBIT 14 page 80**
Madison Advance Contract (includes disguised loan terms and reconciliation clause)

**EXHIBIT 15 page 96**
Notice from Shift 4 – Credit Card processor regarding UCC Lien for Highland Hill Capital LLC

**EXHIBIT 16 page 98**
Wells Fargo Statement (includes several references marked on pages and when referenced)

**MARCUS CARUSO**
708 Nevada Way
Boulder City, NV 89005
(702) 287-0513
emjaillc@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

**MARCUS CARUSO (pro se)**
**PLAINTIFF,**

Plaintiff,

vs.

**MADISON ADVANCE LLC**, et al.,

Defendants

Case No.: 2:25-cv-00888-JCM-MDC

**EXHIBIT INDEX**

# EXHIBIT INDEX

**EXHIBIT 1 page 3**
Highland Hill Capital LLC Contract (unsigned by HHC; includes coercive clauses)

**EXHIBIT 2 page 30**
Zelle Payment Confirmation to "AJ" at Signet Capital (March 20, 2025)

**EXHIBIT 3 page 32**
Zelle Payment Confirmation to "AJ" at Signet Capital (March 21, 2025)

**EXHIBIT 4 page 34**
Wells Fargo ACH Disbursement and Repayment Logs (Madison Advance LLC)

**EXHIBIT 5 page 37**
Wells Fargo Daily ACH Debits (Highland Hill Capital LLC)

**EXHIBIT 6 page 44**
Wells Fargo Weekly ACH Credits (Highland Hill Capital LLC)

**EXHIBIT 7 page 47**
Graphic – The Illusion of Ownership in MCA Predation (Example of HHC Typical Flowchart)

**EXHIBIT 8 page 49**
Verified Complaint filed by Highland Hill Capital LLC in NY State Court (Index No. 514572/2025)

**EXHIBIT 9 page 56**
Verified Complaint filed by Madison Advance LLC in NY State Court (Index No. 515088/2025)

**EXHIBIT 10 page 67**
Affirmation of Service and Notice of Impending Default Judgment – Madison v. Caruso

**EXHIBIT 11 page 70**
DocuSign Stipulation of Settlement sent by Madison Advance LLC (unsigned by Plaintiff)

**EXHIBIT 12 page 75**
Text Message Screenshots from "Alex" at Madison Advance Pressuring Signature

**EXHIBIT 13 page 78**
Demonstrative Infographic Example: Pattern of Fraud, Coercion, and Judgment Abuse (RICO Framework Summary)

**EXHIBIT 14 page 80**
Madison Advance Contract (includes disguised loan terms and reconciliation clause)

**EXHIBIT 15 page 96**
Notice from Shift 4 – Credit Card processor regarding UCC Lien for Highland Hill Capital LLC

**EXHIBIT 16 page 98**
Wells Fargo Statement (includes several references marked on pages and when referenced)

# Exhibit 1

# Highland Hill Capital LLC Contract

# HIGHLAND HILL CAPITAL LLC
## 1100 PARK CENTRAL BLVD S. SUITE 1200, POMPANO BEACH, FL 33064
## Tel (954) 947-8724 Fax (954) 947-5685 E-mail: info@highlandhillcap.com

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 3/20/2025 by and between HIGHLAND HILL CAPITAL LLC ("HHC") and each merchant listed below ("Merchant").

Merchant's Legal Name: Emjai, Llc
D/B/A/: Emjai Llc / Emjai / Oasis Boutique Motel / Maxx's Food And Drink
Fed ID #: 72-1230711
Type of Entity: ______ Corporation __x__ Limited Liability Company ______ Partnership ______ Sole Proprietorship
Business Address: 708 Nevada Way, Boulder City, Nv, 89005
Contact Address: 836 Marina Dr Boulder City, Nv 89005
Additional Address: 1143 Safari Creek Dr Henderson, Nv 89002 / 36 Bergholt Crest Ave Henderson, Nv 89002
E-mail Address: emjaillc@gmail.com
Phone Number: 888-888-8888

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below). This amount may be paid in installments if there is an Addendum stating that it will be paid in installments.* | $ 148,529.21 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold. This amount may be sold in installments if there is an Addendum stating that it will be sold in installments.* | $ 222,645.28 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 35 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below. This amount may be paid in installments if there is an Addendum stating that it will be paid in installments.* | $ 141,102.75 |
| **Net Amount to Be Received Directly by Merchant(s)**<br>*This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to any Addendum to this Agreement. This amount may be paid in installments if there is an Addendum stating that it will be paid in installments. If any deduction is being made from the Purchase Price to pay off another obligation by Merchant(s), then the Net Amount to be Received Directly by Merchant(s) is subject to change based on any change in the amount of the other obligation(s) to be paid off.* | $ 141,102.75 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 1,169.00<br>per Daily |

I have read and agree to the terms and conditions set forth above:

Signed by: [signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to HHC (making HHC the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to HHC. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by HHC, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of HHC and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for HHC and that each Merchant will hold Receivables in trust for HHC in its capacity as a fiduciary for HHC.

The Receivables Purchased Amount shall be paid to HHC by each Merchant irrevocably authorizing only one depositing account acceptable to HHC (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as HHC receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes HHC to ACH debit the specified remittances and any applicable fees listed in Section 2 from the Account on a daily basis as of the next business day after the date of this Agreement and will provide HHC with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). HHC is not responsible for any overdrafts or rejected transactions that may result from HHC's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to HHC for the following fees, where applicable:

A. $7,426.46 - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If HHC considers an Event of Default to have taken place under Section 32.

D. UCC Fee - $195.00 – to cover HHC filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination/amendment fee will be charged if a UCC filing is terminated or amended.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of HHC's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

F. Additional Funding/ "Stacking" Fee: Equal to 25% of Initial Purchase Price – As a result of the MERCHANT/GUARANTOR taking additional funding at any point after being funded by Purchaser, without prior notice to and consent by Purchaser, a fee equal to 25%of the amount of the Purchase Price shall automatically be added to the payback amount of the advance. Purchaser reserves the right to declare the account in default, at any point after learning that such "stacking" has occurred; regardless of the payments made by the MERCHANT/GUARANTOR.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that HHC will collect from Merchant(s) towards the Receivables Purchased Amount during any specific Daily will be capped at $1,169.00 (the "Cap"). If the Specified Percentage of all Receivables for a specific Daily is less than the Cap, then in addition to the Specified Percentage of Receivables for that Daily, HHC will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that Daily does not exceed the Cap. The Cap is not applicable to make up for a business day on which HHC is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, to debit any amount due pursuant to a reconciliation as set forth in I have read and agree to the terms and conditions set forth above:

Signed by:
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

Section 4, for the collection of any of the fees listed in Section 2, or if any Event of Default listed in Section 32 is considered by HHC to have taken place.

**4. Reconciliations**. Any Merchant may request that HHC conduct a reconciliation in order to ensure that the amount that HHC has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. A request for a reconciliation by any Merchant must be made by giving written notice of the request to HHC or by sending an e-mail to INFO@HIGHLANDHILLCAP.COM stating that a reconciliation is being requested. In order to effectuate the reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of this Agreement through the date of the request for a reconciliation. HHC will complete each reconciliation requested by any Merchant within two business days after receipt of proper notice of a request for one accompanied by the information and documents required for it. HHC may also conduct a reconciliation on its own at any time by reviewing Merchant(s)'s Receivables covering the period from the date of this Agreement until the date of initiation of the reconciliation, each such reconciliation will be completed within two business days after its initiation, and HHC will give each Merchant written notice of the determination made based on the reconciliation within one business day after its completion. If a reconciliation determines that HHC collected more than it was entitled to, then HHC will credit to the Account all amounts to which HHC was not entitled. If a reconciliation determines that HHC collected less than it was entitled to, then HHC will debit from the Account all additional amounts to which HHC was entitled. Nothing herein limits the amount of times that a reconciliation may be requested or conducted.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying HHC the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to HHC, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide HHC and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize HHC and/or its agent(s) to deduct the amounts owed to HHC for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to HHC by permitting HHC to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent HHC's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until HHC receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 27, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, and 55 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to HHC under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes HHC and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to HHC any bank or financial statements, tax returns, and other documents and records, as HHC deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. HHC is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** HHC may choose to monitor and/or record

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between HHC and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for HHC to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

HHC may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives HHC permission to call or send a text message to any telephone number given to HHC in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives HHC permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that HHC will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that HHC has no liability for any such charges.

11. **Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of HHC's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. HHC may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to HHC. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize HHC, its agents and representatives, and any credit-reporting agency engaged by HHC, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to HHC under this Agreement or for HHC's ability to determine any Merchant's eligibility to enter into any future agreement with HHC. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to HHC under the Fair Credit Reporting Act, authorizing HHC to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes HHC to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to HHC under the Fair Credit Reporting Act, authorizing HHC to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes HHC to obtain such information in accordance with a merchant cash advance application.

12. **Transactional History.** Each Merchant authorizes its bank to provide HHC with its banking and/or credit card processing history.

13. **Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by HHC for monies owed to HHC from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by HHC.

I have read and agree to the terms and conditions set forth above:

Signed by:
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**14. No Liability.** In no event will HHC be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and HHC agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HHC to any Merchant. HHC is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in HHC not receiving the Receivables Purchased Amount. Any Merchant going bankrupt or going out of business or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. HHC has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to HHC in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints HHC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HHC, or, if HHC considers an Event of Default to have taken place under Section 32, to settle all obligations due to HHC from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 31); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HHC; and (v) to file any claims or take any action or institute any proceeding which HHC may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by HHC, immediately and without notice to any Merchant in the event HHC considers any Event of Default listed in Section 32 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. HHC may enforce the provisions of the Guarantee against Guarantor.

Protection 3. HHC may enforce its security interest in the Collateral identified in Section 31.

Protection 4. HHC may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by HHC, Merchant shall deliver to HHC an executed assignment of lease of each Merchant's premises in favor of HHC. Upon breach of any provision in this Section 17, HHC may exercise its rights under such assignment of lease.

Protection 6. HHC may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. HHC will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to HHC of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to HHC an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints HHC and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to HHC as contemplated by this Section.

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

18. **Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes HHC to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against HHC or any of its affiliates relating to any (i) investigation undertaken by or on behalf of HHC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

19. **Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by HHC, including this Agreement and any other HHC documents (collectively, "Confidential Information") are proprietary and confidential information of HHC. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of HHC to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

20. **D/B/As.** Each Merchant hereby acknowledges and agrees that HHC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HHC and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

21. **Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to HHC, and future statements which will be furnished hereafter at the request of HHC, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise HHC of any material adverse change in its financial condition, operation, or ownership.

22. **Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

23. **Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

24. **Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without HHC's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

25. **Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to HHC or change any place(s) of its business without prior written consent from HHC.

26. **Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior written notice from HHC to that Merchant, execute, acknowledge, and deliver to HHC and/or to any other person or entity specified by HHC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

27. **No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

28. **Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of HHC, other than any for which HHC has actual or constructive knowledge as of the date of this Agreement.

29. **Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than HHC any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of HHC.

30. **Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

31. **Security Interest.** To secure each Merchant's performance obligations to HHC under this Agreement and any future agreement with HHC, each Merchant hereby grants to HHC a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, and instruments, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to HHC under any other agreement between any Merchant or Guarantor and HHC (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as HHC deems necessary to perfect or maintain HHC's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes HHC to file any financing statements deemed necessary by HHC to perfect or maintain HHC's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to HHC with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with HHC's rights. Each Merchant shall be liable for and HHC may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by HHC in protecting, preserving, and enforcing HHC's security interest and rights. Each Merchant further acknowledges that HHC may use another legal name and/or D/B/A or an agent when designating the Secured Party when HHC files the above-referenced financing statement(s).

32. **Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any representation or warranty by any Merchant to HHC that proves to have been made intentionally false or misleading in any material respect when made;

(2) Any Merchant changes the Account without providing written notice to HHC within one business day thereafter;

(3) HHC is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(4) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

Account within two business days after a written request for same is made by HHC;

(5) Any Merchant causes any ACH debit to the Account by HHC to be blocked or stopped without providing any advance written notice to HHC, which notice may be given by e-mail to INFO@HIGHLANDHILLCAP.COM;

(6) Any Merchant intentionally prevents HHC from collecting any part of the Receivables Purchased Amount; or

(7) Any Merchant causes any ACH debit to the Account by any person or entity to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide HHC with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to INFO@HIGHLANDHILLCAP.COM.

**33. Remedies.** In case any Event of Default occurs and is not waived, HHC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of HHC in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by HHC after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, HHC may elect that Merchant(s) be required to pay to HHC 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by HHC in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), HHC will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to HHC's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount.

**34. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HHC, which consent may be withheld in HHC's sole discretion. HHC may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 31 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by HHC, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or HHC) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between HHC and such assignee (the "Assignment Agreement"), have the rights and obligations of HHC under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, HHC's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, HHC may disclose all information that HHC has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon HHC's request.

**35. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement or by text message to the Phone Number listed on the first page of this Agreement if that phone number is for a mobile phone. Each Merchant must set its spam or junk mail filter to accept e-mails sent by INFO@HIGHLANDHILLCAP.COM and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

I have read and agree to the terms and conditions set forth above:

Signed by:
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**36. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement, any dispute or claim relating hereto, whether sounding in contract, tort, law, equity, or otherwise, the relationship between HHC and each Merchant, and the relationship between HHC and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws. Each Merchant represents that it does not have a principal place of business located in the Commonwealth of Virginia and that therefore the provisions of Chapter 22.1 of Title 6.2 of the Virginia Code are not applicable to this Agreement.

**37. Venue and Forum Selection.** Any litigation relating to this Agreement, whether sounding in contract, tort, law, equity, or otherwise, involving HHC on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. Notwithstanding any provision in this Agreement to the contrary, in addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to HHC may be commenced and maintained in any other court that would otherwise be of competent jurisdiction, and each Merchant and each Guarantor agree that those courts are convenient, submit to the jurisdiction of those courts, waive any and all objections to the jurisdiction or venue of those courts, and may oppose any motion or application made by any party to transfer any such litigation to an Acceptable Forum.

**38. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**39. Counterclaim Waiver.** In any litigation or arbitration commenced by HHC, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**40. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim, whether sounding in contract, tort, law, equity, or otherwise, that is not asserted against HHC within one year after its accrual will be time barred. Notwithstanding any provision in this Agreement to the contrary, each Merchant and each Guarantor agree that any application made by any of them to stay an arbitration initiated against any of them by HHC will be time barred if made more than 20 days after receipt of the demand for arbitration.

**41. Costs.** Each Merchant and each Guarantor must pay all of HHC's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**42. Prejudgment and Post-judgment Interest.** If HHC becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then HHC will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a post-judgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**43. Legal Fees.** If HHC prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay HHC's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**44. Class Action Waiver.** HHC, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**45. Arbitration.** Any action or dispute, whether sounding in contract, tort, law, equity, or otherwise, relating to this Agreement or involving HHC on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration in the State of New York. A judgment of the court shall be entered upon the award made pursuant to the arbitration. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation And Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Notwithstanding any provision to the contrary in the arbitration rules of the arbitral forum selected, the arbitration will be heard by a single arbitrator and not by a panel of arbitrators, any arbitration hearing relating to this Agreement must be held in the Counties of Nassau, New York, Queens, or Kings in the State of New York, and any witness in an arbitration hearing who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made, and the application will be governed by and construed in accordance with the laws under which the application is made, without regard to any applicable principles of conflict of laws. The arbitration agreement contained herein may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of HHC.

**46. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to HHC by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by HHC demonstrating that HHC was provided with notice of a change in the Contact Address.

**47. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**48. Waiver.** No failure on the part of HHC to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**49. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to HHC by or received assistance in entering into this Agreement or its Guarantee from an I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of HHC. Each Merchant and each Guarantor acknowledge that HHC is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify HHC and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that HHC does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**50. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**51. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**52. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**53. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**54. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein.

**55. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

I have read and agree to the terms and conditions set forth above:

Signed by:
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

STANDARD MERCHANT CASH ADVANCE AGREEMENT

EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: Marcus C Caruso (Print Name) Owner (Print Title) Signed by: [signature] 17FCB9D0BF55462... (Signature)

SS# 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 Driver License Number 1800024149

**FOR THE MERCHANT/OWNER (#2)**

By: ______________ (Print Name) ______________ (Print Title) ______________ (Signature)

SS# ______________ Driver License Number ______________

Approved for HIGHLAND HILL CAPITAL LLC by: ______________

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated 3/20/2025, of the Standard Merchant Cash Advance Agreement, dated 3/20/2025 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between HIGHLAND HILL CAPITAL LLC ("HHC") and Emjai, Llc ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to HHC in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** HHC may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives HHC permission to call or send a text message to any telephone number given to HHC in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives HHC permission to communicate such information to them by e-mail. Each Guarantor agrees that HHC will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that HHC has no liability for any such charges.

**G3. Guarantor Waivers.** If HHC considers any Event of Default to have taken place under the Agreement, then HHC may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral or Cross-Collateral HHC may hold pursuant to this Guarantee or any other agreement or guarantee. HHC does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) HHC's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to HHC. In addition, HHC may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to HHC; (ii) if there is more than one Merchant, release a Merchant from its obligations to HHC such that at least one Merchant remains obligated to HHC; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to HHC under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement, this Guarantee, any dispute

I have read and agree to the terms and conditions set forth above:

Signed by:
17FC89D03E55462...

Marcus C Caruso

Owner

3/20/2025

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

or claim relating to the Agreement or this Guarantee, whether sounding in contract, tort, law, equity, or otherwise, the relationship between HHC and each Merchant, and the relationship between HHC and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G6. Venue and Forum Selection.** Any litigation, whether sounding in contract, tort, law, equity, or otherwise, relating to the Agreement or this Guarantee or involving HHC on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. Notwithstanding any provision in this Agreement to the contrary, in addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to HHC may be commenced and maintained in any other court that would otherwise be of competent jurisdiction, and each Merchant and each Guarantor agree that those courts are convenient, submit to the jurisdiction of those courts, waive any and all objections to the jurisdiction or venue of those courts, and may oppose any motion or application made by any party to transfer any such litigation to an Acceptable Forum.

**G7. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with HHC.

**G8. Counterclaim Waiver.** In any litigation or arbitration commenced by HHC, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G9. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim, whether sounding in contract, tort, law, equity, or otherwise, that is not asserted against HHC within one year of its accrual will be time barred. Notwithstanding any provision in the Agreement or this Guarantee to the contrary, each Merchant and each Guarantor agree that any application made by any of them to stay an arbitration initiated against any of them by HHC will be time barred if made more than 20 days after receipt of the demand for arbitration.

**G10. Costs.** Each Merchant and each Guarantor must pay all of HHC's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G11. Prejudgment and Post-judgment Interest.** If HHC becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then HHC will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a post-judgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G12. Legal Fees.** If HHC prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay HHC's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G13. Class Action Waiver.** HHC, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G14. Arbitration.** Any action or dispute, whether sounding in contract, tort, law, equity, or otherwise, relating to the Agreement, this Guarantee, or involving HHC on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration in the State of New York. A judgment of the court shall be entered upon the award made pursuant to the arbitration. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation And Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Notwithstanding any provision to the contrary in the arbitration rules of the arbitral forum selected, the arbitration will be heard by a single arbitrator and not by a panel of arbitrators, any arbitration relating to the Agreement or this Guarantee must be held in the Counties of Nassau, New York, Queens, or Kings in the State of New York, and any witness in an arbitration hearing who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the products of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made, and the application will be governed by and construed in accordance with the laws under which the application is made, without regard to any applicable principles of conflict of laws. The arbitration agreement contained herein may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of HHC.

**G15. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to HHC by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by HHC demonstrating that HHC was provided with notice of a change in the Contact Address.

**G16. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G17. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, and G21 shall survive any termination of this Guarantee.

**G18. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G19. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

I have read and agree to the terms and conditions set forth above:

Signed by:
[signature]
17FCB9D0BE55462...

Marcus C Caruso

Owner

3/20/2025

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G20. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G21. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

**EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE**

**GUARANTOR (#1)**

By: Marcus C Caruso ______________________ Signed by: ______________________
(Print Name) (Signature) 17FCB9D0BE55462...

SS# 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 ______________________ Driver License Number 1800024149 ______________________

**GUARANTOR (#2)**

By: ______________________ ______________________
(Print Name) (Signature)

SS# ______________________ Driver License Number ______________________

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

We look forward to being your funding partner.

You authorize HIGHLAND HILL CAPITAL LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

HIGHLAND HILL CAPITAL LLC will require viewing access to your bank account each business day.

HIGHLAND HILL CAPITAL LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

*** Be sure to indicate capital or lower case letters.**

Name of bank: Wells Fargo Bank

Name of account: Emjai, Llc

Account number: 2129533804 Routing number: 321270742

Bank portal website: ______

Username: ______

Password: ______

Security Question/Answer 1: ______

Security Question/Answer 2: ______

Security Question/Answer 3: ______

Any other information necessary to access your account: ______

If you have any questions please feel free to contact us directly at (954) 947-8724.

I have read and agree to the terms and conditions set forth above:

Signed by: [signature] 17FCB9D0BE55462...

| | |
|---|---|
| Name: Marcus C Caruso | Name: |
| Title: Owner | Title: |
| Date: 3/20/2025 | Date: 20 |

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ESTIMATED PAYMENTS

This is an Addendum, dated 3/20/2025, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 3/20/2025, between HIGHLAND HILL CAPITAL LLC ("HHC") and Emjai, Llc ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the 35 % Specified Percentage of Merchant's Receivables, HHC may instead debit $ 1,169.00 ("Estimated Payment") from the Account every Daily. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

Any Merchant may give written notice to HHC requesting that HHC conduct a reconciliation in order to ensure that the amount that HHC has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to INFO@HIGHLANDHILLCAP.COM and such notice will be deemed to have been received if and when HHC sends a reply e-mail (but not a read receipt). If such reconciliation determines that HHC collected more than it was entitled to, then within seven days thereafter, HHC will credit to the Account all amounts to which HHC was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that HHC collected less than it was entitled to, then within seven days thereafter, HHC will debit from the Account all additional amounts to which HHC was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. HHC will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: Marcus C Caruso (Print Name) Owner (Print Title) Signed by: [signature] 17FCB0D0BE55462... (Signature)

**FOR THE MERCHANT/OWNER (#2)**

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ADDITIONAL FEES**

This is an Addendum, dated 3/20/2025, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 3/20/2025, between HIGHLAND HILL CAPITAL LLC ("HHC") and Emjai, Llc ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by HHC is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives HHC advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by HHC and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by HHC or may be collected in addition to any other payment collected by HHC under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: Marcus C Caruso Owner ____________ Signed by: [signature] 17FCB9D0BB55462...
(Print Name and Title) (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: ______________________ ______________________
(Print Name and Title) (Signature)

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1. I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated 3/20/2025, between HIGHLAND HILL CAPTIAL LLC ("HHC") and Emjai, Llc ("Merchant") on behalf of Merchant.
2. This Declaration incorporates by reference the Agreement and every addendum to it.
3. I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.
4. I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.
5. I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.
6. I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.
7. I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.
8. I acknowledge that the payments to be made from any Merchant to HHC under the Agreement are being made in the ordinary course of each Merchant's business.
9. I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.
10. **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 3/20/2025
(Date)

**FOR THE MERCHANT/OWNER (#1)**

By: Marcus C Caruso (Print Name) Owner (Print Title) Signed by: [signature] 17FCB9D0BE55462... (Signature)

**FOR THE MERCHANT/OWNER (#2)**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## AUTHORIZATION TO INITIATE ACH DEBIT ENTRIES

Name of Company HIGHLAND HILL CAPITAL LLC

---

**CUSTOMER INFORMATION**

I hereby authorize HIGHLAND HILL CAPITAL LLC as shown above, hereinafter called COMPANY, to initiate debit entries to my bank account as detailed below, and to debit the same to such account. Should a transaction be returned, I further authorize debiting this account for non-sufficient fund fees according to applicable State Law. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. Law.

Full Name on Account: Emjai, Llc

Account #: 2129533804 Routing #: 321270742

Account Type (select one): ☒Checking ☐Savings

Account Class (select one): ☐Consumer Account ☒Business Account

Debit Payment Details:

Payment Amount: 1,169.00

Frequency of payments: Daily

(example: one-time, daily, etc.)

I agree to be bound by the ACH Rules as defined by the National ACH Association (NACHA). I understand that this authorization is to remain in full force and effect until Company has received written notification from me of its termination at least five (5) business days prior to the payment due date. I further understand that canceling my ACH authorization does not relieve me of the responsibility of paying my account in full, and that if I cancel or revoke this authorization before any remaining debt is paid in full, the Company may take additional actions including legal actions to secure the debt.

Customer Signature: Signed by: [signature] 17FCB9D0BE55462... Date: 3/20/2025

(Authorized Signer for Account)

Customer Printed Name: Marcus C Caruso

Customer Contact Telephone #: 888-888-8888

Docusign Envelope ID: F7593B3B-571C-4A66-872D-25ACA3B204C0

ver. 1/1/23

# STANDARD MERCHANT CASH ADVANCE AGREEMENT
## ADDENDUM C
## CHANGING FREQUENCY OF ESTIMATED PAYMENTS

This is an Addendum, dated 3/20/2025, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 3/20/2025, between HIGHLAND HILL CAPITAL ("HHC") and Emjai, Llc ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

**C1. Changing Frequency of Estimated Payment.** Upon one day's advance written notice to Merchant(s), HHC may elect to change the frequency of the Estimated Payment from daily to weekly or from weekly to daily. If the frequency of the Estimated Payment is being changed from weekly to daily, then the amount of the daily Estimated Payment will be one fifth of the amount of the weekly Estimated Payment. If the frequency of the Estimated Payment is being changed from daily to weekly, then the amount of the weekly Estimated Payment will be five times of the amount of the daily Estimated Payment. No Estimated Payment will be debited on a daily basis during a week in which a weekly payment was already successfully collected from the Account. If any Estimated Payment was debited from the Account on a daily basis, then any Estimated Payment debited on a weekly basis during that week must be reduced by the total of all daily payments already successfully collected from the Account for that week.

**FOR THE MERCHANT/OWNER (#1)**

By: Marcus C Caruso | Owner | Signed by: [signature] 17FCB9D0BE55462...

(Print Name) (Print Title) (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: ______________________________

(Print Name) (Print Title) (Signature)

Docusign Envelope ID: F7593B3B-571C-4A66-872D-25ACA3B204C0

# ADDENDUM

## DISBURSEMENT SCHEDULE
## Addendum to the Secured Merchant Agreement and all Exhibits/Appendix relating thereto (the "Agreement")

**In the event of any conflict between any of the provisions of the Addendum and any of the provisions of the Agreement, the provisions of this Addendum shall control.**

1. **Merchant Acknowledgment.** Merchant acknowledges that the funding being provided pursuant to the Agreement is intended to be disbursed in weekly disbursements. It is further understood that Merchant shall only receive the entire Purchased Amount set forth on page 1 of the Agreement and the weekly disbursements, if Merchant fully complies with the terms of the Agreement Addendum and maintains its account with HHC in good standing.

2. **Stacking Prohibited.** Merchant acknowledges that it has read and fully understood Sections 17 "Protections against Default," and Section 32 "Events of Default," of the Agreement. Merchant further acknowledges that "Stacking," (defined to mean not only receiving, but the entering into of any arrangement, agreement or commitment that in any way relates to a merchant cash advance, a loan, or involves its Receipts) shall be considered an act that reduces the value of the Collateral under this Agreement and shall be an Event of Default. Thus, for the duration of this Agreement, Seller shall not enter into any arrangement, agreement or commitment that in any way relates to a merchant cash advance, a loan, or involves its Receipts, with any party other than HHC, without the expressed written consent of HHC. Further, Merchant shall not enter into any agreement or commitment that in any way may reduce the value of the Receipts, including by obtaining any new credit cards or lines of credit, without the expressed written consent of HHC.

3. **Purchases of Merchant's Future Receipts**: Pursuant to the Agreement, Merchant hereby sells, assigns and transfers to HHC (making HHC the absolute owner) the Specified Percentage of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (the "Receipts") for the payment of Merchant's sale of goods or services, until the Purchased Amount specified on Page 1 of the Agreement has been remitted from the Merchant to HHC.

4. **Assignment Effective Immediately**. It is the intention of the parties that the aforementioned Purchased Amount of the Specified Percentage of the Receipts shall be assigned immediately, subject only to HHC providing the first installment in Section 7 below (minus only the fees set forth in the Agreement). HHC shall thereafter provide the remainder of the Purchased Amount specified on Page 1 of the Agreement in weekly installments as set forth below.

5. **Right to Terminate.** HHC reserves the right to terminate its obligation to make the weekly Disbursements at its option at any time after HHC determines that there was: (i) Any Event of Default, as defined in the Agreement and/or in this Addendum; (ii) Merchant fails to provide to HHC a monthly Account statement, access codes to the Online Login Account, , updated accounts receivable ledgers or a snap shot of the Merchant's bank statements, (iii) Merchant breaches the Stacking provision set forth in Section 2 hereunder, (iv) Merchant has a negative balance with HHC or payments that have not cleared due to insufficient funds, (v) or any other breach of the Agreement. Merchant shall also be entitled to terminate the weekly disbursements at any time, and then only be obligated to pay the Receipts up to until the Total Minimum Amount Purchased specified next to amount of such weekly installment.

6. **Calculation of Purchased Amount**. If weekly deployments are terminated, the amount of receipts actually purchased, shall retroactively be the total of the purchased amounts as is set forth next to each weekly installment (the "Weekly Amounts"), as is recalculated by multiplying the actual funds disbursed plus the underwriting fees and other fees times the factor rate of 1.49900 , and adding up all such Weekly Amounts based on how many installments have been disbursed. Merchant will at all times remain obligated to deliver the Specified Percentage or the alternative Specific Daily Amount to HHC until HHC has received the Receipts purchased prior to the termination of Disbursements, and to comply with all other provisions of this Agreement. In addition, upon the occurrence of an event of default, HHC may call for full repayment of the purchased receipts and may declare a default and avail itself of all remedies thereunder. In the event it shall ever be adjudicated that the original sale and assignment of the Specified Percentage of the Receipts was up to the Purchased Amount set forth on Page 1, then HHC shall reassign all Receipts in excess of the Total Minimum Amount Purchased based on adding up the Weekly Amounts, to the Merchant.

7. **Weekly Deposits.** The following is an outline of the exact Weekly Deposit, the Weekly Purchased Amount, and the Total Minimum Amount Purchased as agreed to by both parties, pursuant to this Addendum and the Merchant Agreement:

| Installments | Weekly Deposit | Weekly Purchased Amount | Total Minimum Amount Purchased |
|---|---|---|---|
| First Installment - Week 1 | $8,212.92 | $ 12,959.12 | $ 12,959.12 |
| Week 2 | $8,212.92 | $ 12,959.12 | $25,918.25 |
| Week 3 | $8,212.92 | $ 12,959.12 | $38,877.37 |
| Week 4 | $8,212.92 | $ 12,959.12 | $ 51,836.49 |
| Week 5 | $8,212.92 | $ 12,959.12 | $64,795.62 |
| Week 6 | $8,212.92 | $ 12,959.12 | $ 77,754.74 |
| Week 7 | $8,212.92 | $ 12,959.12 | $90,713.86 |
| Week 8 | $8,212.92 | $ 12,959.12 | $ 103,672.99 |
| Week 9 | $8,212.92 | $ 12,959.12 | $116,632.11 |
| Week 10 | $8,212.92 | $ 12,959.12 | $ 129,591.23 |
| Week 11 | $8,212.92 | $ 12,959.12 | $ 142,550.36 |
| Week 12 | $8,212.92 | $ 12,959.12 | $155,509.48 |
| Week 13 | $8,212.92 | $ 12,959.12 | $ 168,468.60 |
| Week 14 | $8,212.92 | $ 12,959.12 | $ 181,427.73 |
| Week 15 | $8,212.92 | $ 12,959.12 | $194,386.85 |
| Week 16 | $7,118.00 | $ 11,231.45 | $ 205,618.30 |
| Week 17 | $3,752.20 | $ 5,920.58 | $ 211,538.88 |
| Week 18 | $1,800.00 | $2,840.21 | $ 214,379.09 |
| Week 19 | $1,800.00 | $2,840.21 | $ 217,219.30 |
| Week 20 | $1,800.00 | $ 2,840.21 | $ 220,059.51 |
| Week 21 | $ 1,638.75 | $ 2,585.77 | $ 222,645.28 |
| Week 22 | $0.00 | $ 0.00 | $ 0.00 |
| Week 23 | $0.00 | $ 0.00 | $ 0.00 |
| Week 24 | $0.00 | $ 0.00 | $ 0.00 |
| Week 25 | $0.00 | $ 0.00 | $ 0.00 |

THE TERMS OF THIS ADDENDUM ARE HEREBY INCORPORATED IN AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE.

BUSINESS LEGAL NAME : Emjai, Llc

FOR THE MERCHANT #1

NAME: Marcus C Caruso SIGN: Signed by: 17FCB9D0BE55462...

FOR THE MERCHANT #2

NAME:__________ SIGN:__________

FOR THE GUARANTOR #1:

NAME: Marcus C Caruso SIGN: Signed by: 17FCB9D0BE55462...

FOR THE GUARANTOR #2:

NAME:__________ SIGN:__________

HIGHLAND HILL CAPITAL LLC SIGNATURE:__________

# Exhibit 2

# Zelle Payment #1 Confirmation to “AJ” at Signet Capital 3-20-25

8:12

Need help? 5

5 Sign off

# Payment details

$5,000.00

Sent to

**Signet**

accounting@signetcapitalgroup.com

**Completed**

**Sent on**

03/20/2025

**Enrolled as**

SIGNET CAPITAL GROUP INC.

**Pay from**

BUSINESS CHECKING ...1317

**Memo**

First fee installment

Accounts Deposit Pay & Transfer Explore Menu

# Exhibit 3

# Zelle Payment #2 Confirmation to "AJ" at Signet Capital 3-21-25

8:12 39

Need help? 5 5 Sign off

# Payment details

$5,000.00

Sent to

**Signet**

accounting@signetcapitalgroup.com

**Completed**

**Sent on**

03/21/2025

**Enrolled as**

SIGNET CAPITAL GROUP INC.

**Pay from**

BUSINESS CHECKING ...3804

**Memo**

2nd fee installment.

Accounts Deposit Pay & Transfer Explore Menu

# Exhibit 4

# Wells Fargo ACH Disbursement and Repayment Logs (Madison Advance LLC)

WELLS FARGO

BUSINESS CHECKING
Account
...3804
Routing numbers

$1.40
Available balance

**Account & balance info**

| | |
|---|---|
| **Ending collected balance as of 04/30/25** | $2.40 |
| **Current posted balance** | $2.40 |
| **Pending withdrawals/debits** | -$1,401.00 |
| **Pending deposits/credits** | +$1,400.00 |
| **Available balance** | **$1.40** |
| **Monthly Service Fee Summary** | |

## Activity

First
Previous
Next

| Date | Description | Deposits/Credits | Withdrawals/Debits |
|---|---|---|---|
| **Pending Transactions** | | | |
| | No pending transactions meet your search criteria. Please try again. | | |
| **Posted Transactions** | | | |
| 04/22/25 | BUSINESS TO BUSINESS ACH MADISON ADVANCE 2132470597 250421 EMJAI LLC | | $2,343.00 |
| 04/15/25 | BUSINESS TO BUSINESS ACH MADISON ADVANCE 2132470597 250414 EMJAI LLC | | $2,343.00 |
| **Totals** | | **$23,250.00** | **$11,750.00** |

| | | | |
|---|---|---|---|
| 04/14/25 | BUSINESS TO BUSINESS ACH MADISON ADVANCE 2132470597 250411 EMJAI LLC | | $2,343.00 |
| 04/08/25 | BUSINESS TO BUSINESS ACH MADISON ADVANCE 2132470597 250407 EMJAI LLC | | $2,343.00 |
| 03/28/25 | OVERDRAFT FEE FOR A TRANSACTION POSTED ON 03/27 $2,343.00 MADISON ADVANCE 2132470597 250326 EMJAI LLC | | $35.00 |
| 03/27/25 | BUSINESS TO BUSINESS ACH MADISON ADVANCE 2132470597 250326 EMJAI LLC | | $2,343.00 |
| 03/20/25 | WT FED#03788 OPTIMUMBANK /ORG=MADISON ADVANCE LLC SRF# 0670150960187350 TRN#250320191266 RFB# EMJAI | $23,250.00 | |
| **Totals** | | **$23,250.00** | **$11,750.00** |

Back to top

First
Previous
Next

## *Account Disclosures

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.

Equal Housing Lender

# Exhibit 5

## Wells Fargo Daily ACH Debits
## (Highland Hill Capital LLC)

# WELLS FARGO

BUSINESS CHECKING
Account
...3804
Routing numbers

$1.40
Available balance

**Account & balance info**

| | |
|---|---|
| **Ending collected balance as of 04/30/25** | $2.40 |
| **Current posted balance** | $2.40 |
| **Pending withdrawals/debits** | -$1,401.00 |
| **Pending deposits/credits** | +$1,400.00 |
| **Available balance** | **$1.40** |
| **Monthly Service Fee Summary** | |

## Activity

First
Previous
Next

| Date | Description | Deposits/Credits | Withdrawals/Debits |
|---|---|---|---|
| **Pending Transactions** | | | |
| No pending transactions meet your search criteria. Please try again. | | | |
| **Posted Transactions** | | | |
| 04/21/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250418 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/17/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 | | $1,169.00 |
| **Totals** | | **$0.00** | **$23,380.00** |

| | | | |
|---|---|---|---|
| | 250416 (954) 947-8724 EMJAI LLC DBA OASIS BO | | |
| 04/16/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250415 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/15/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250414 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/14/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250411 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/11/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250410 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/09/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250408 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/08/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA RETRY PYMT 250407 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/08/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA RETRY PYMT 250407 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/08/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250407 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/07/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250404 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| **Totals** | | **$0.00** | **$23,380.00** |

| | | | |
|---|---|---|---|
| 04/03/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250402 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 04/02/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250401 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/31/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250328 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/28/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250327 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/27/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250326 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/26/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250325 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/25/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250324 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/24/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250321 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| 03/21/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250320 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $1,169.00 |
| **Totals** | | **$0.00** | **$23,380.00** |

Back to top

First

Previous
Next

## *Account Disclosures

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.

Equal Housing Lender

WELLS FARGO

BUSINESS CHECKING
Account
...3804
Routing numbers

$1.40
Available balance

**Account & balance info**

| | |
|---|---|
| **Ending collected balance as of 04/30/25** | $2.40 |
| **Current posted balance** | $2.40 |
| **Pending withdrawals/debits** | -$1,401.00 |
| **Pending deposits/credits** | +$1,400.00 |
| **Available balance** | **$1.40** |
| **Monthly Service Fee Summary** | |

## Activity

First
Previous
Next

| Date | Description | Deposits/Credits | Withdrawals/Debits |
|---|---|---|---|
| **Pending Transactions** | | | |
| | No pending transactions meet your search criteria. Please try again. | | |
| **Posted Transactions** | | | |
| 04/25/25 | BUSINESS TO BUSINESS ACH HighlandHillCap 9549478724 XXXXX1338 EMJAI LLC DBA OASIS BO | | $399.00 |
| 04/24/25 | BUSINESS TO BUSINESS ACH HighlandHillCap 9549478724 | | $399.00 |
| **Totals** | | **$0.00** | **$1,197.00** |

| | | | |
|---|---|---|---|
| | XXXXX8011 EMJAI LLC DBA OASIS BO | | |
| 04/22/25 | BUSINESS TO BUSINESS ACH HIGHLAND HILL CA 9549478724 250421 (954) 947-8724 EMJAI LLC DBA OASIS BO | | $399.00 |
| **Totals** | | **$0.00** | **$1,197.00** |

Back to top

First
Previous
Next

## *Account Disclosures

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.

Equal Housing Lender

# Exhibit 6

## Wells Fargo Weekly ACH Credits (Highland Hill Capital LLC)

WELLS FARGO

BUSINESS CHECKING
Account
...3804
Routing numbers

$1.40
Available balance

**Account & balance info**

| | |
|---|---|
| **Ending collected balance as of 04/30/25** | $2.40 |
| **Current posted balance** | $2.40 |
| **Pending withdrawals/debits** | -$1,401.00 |
| **Pending deposits/credits** | +$1,400.00 |
| **Available balance** | **$1.40** |
| **Monthly Service Fee Summary** | |

## Activity

First
Previous
Next

| Date | Description | Deposits/Credits | Withdrawals/Debits |
|---|---|---|---|
| **Pending Transactions** | | | |
| No pending transactions meet your search criteria. Please try again. | | | |
| **Posted Transactions** | | | |
| 04/15/25 | WT SEQ455150 HIGHLAND HILL CAPITAL L /ORG=HIGHLAND HILL CAPITAL LLC SRF# GW00000075820843 TRN#250415455150 RFB# 709 | $8,212.92 | |
| **Totals** | | **$32,851.68** | **$0.00** |

| | | | |
|---|---|---|---|
| 04/08/25 | HIGHLANDHILLCAP WEEK 3 250407 RPMT-0001820 EMJAI, LLC | $8,212.92 | |
| 03/28/25 | HIGHLANDHILLCAP WEEK 2 250327 RPMT-0001820 EMJAI, LLC | $8,212.92 | |
| 03/21/25 | HIGHLANDHILLCAP RPMT-1820 250320 WEEK 1 EMJAI, LLC | $8,212.92 | |
| **Totals** | | **$32,851.68** | **$0.00** |

Back to top

First
Previous
Next

## *Account Disclosures

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.

Equal Housing Lender

# Exhibit 7

## Graphic – The Illusion of Ownership In MCA Predation (Example of HHC Typical Flowchart)

# STACK & SEIZE:

## THE ILLUSION OF OWNERSHIP IN MCA PREDATION




HHC claimed to purchase receivables that were already contractually sold. Then sued the borrower for default on a loan it never made.

# Exhibit 8

# Verified Complaint filed by Highland Hill Capital LLC 05-01-2025 in NY State Court (Index No. 514572/2025)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
---------------------------------------------------------------------X
HIGHLAND HILL CAPITAL LLC,

Plaintiff,

-against-

EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL / MAXX'S FOOD AND DRINK and MARCUS C CARUSO,

Defendants.
---------------------------------------------------------------------X

**Index No.:**

**SUMMONS**

To the above-named defendant(s):

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiff's Attorney within 20 days after the service of this summons, exclusive of the day of service, or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York, and in case of your failure to appear or answer, judgment will be taken by default for the relief demanded in the complaint.

Plaintiff designates Kings County as the place of trial. Venue is based on contract.

Dated: May 1, 2025
Cedarhurst, New York

THE LAW OFFICE OF JACOB Z. WEINSTEIN, PLLC
Attorney for Plaintiff

*Jacob Weinstein*
JACOB Z. WEINSTEIN
420 Central Avenue, Ste 301
Cedarhurst, NY 11516
TELEPHONE: (646) 450-3484
FACSIMILE: (646) 661-1772
E-MAIL: Jacob@weinsteinllp.com

**Defendants Addresses:**

EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL / MAXX'S FOOD AND DRINK
708 Nevada Way
Boulder City, NV 89005

MARCUS C CARUSO
836 Marina Dr
Boulder City, NV 89005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------------X

HIGHLAND HILL CAPITAL LLC,

Plaintiff,

**Index No.:**

**VERIFIED COMPLAINT**

-against-

EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL /
MAXX'S FOOD AND DRINK and MARCUS C CARUSO,

Defendants.

--------------------------------------------------------------------X

Plaintiff, HIGHLAND HILL CAPITAL LLC ("Plaintiff") by and through its attorneys, The Law Office of Jacob Z. Weinstein, PLLC, providing upon information and belief the following Verified Complaint against Defendants, EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL / MAXX'S FOOD AND DRINK ("Company Defendant") and MARCUS C CARUSO ("Guarantor"), (Company Defendant and Guarantor are collectively referred to herein as "Defendants"), and states and alleges as follows:

## PARTIES

1. At all relevant times, Plaintiff maintains a place of business in New York.

2. Upon information and belief, at all relevant times, EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL / MAXX'S FOOD AND DRINK, is located in Nevada with an address of 708 Nevada Way, Boulder City, NV 89005.

3. Upon information and belief, at all relevant times, MARCUS C CARUSO resides in Nevada with an address of 836 Marina Dr, Boulder City, NV 89005.

## FACTS

4. On or about March 20, 2025, Plaintiff and Defendants entered into an Agreement (the "Agreement") whereby Plaintiff agreed to purchase Company Defendant' future receivables. A copy of the Agreement is attached as **Exhibit A**.

5. The Agreement contains the Defendants express consent to the jurisdiction and venue of the state courts within New York.

6. Pursuant to the Agreement, Company Defendant agreed to have one bank account approved by Plaintiff (the "Bank Account") from which Defendants authorized Plaintiff to make ACH withdrawals until the contracted purchased amount was fully paid to Plaintiff.

7. Pursuant to the Disbursement Schedule Addendum of the Agreement, Plaintiff remitted 4 weekly deposits for the purchase price of $32,851.68, less applicable fees, for the future receivables to Company Defendant, as agreed for the purchase amount of $51,836.49.

8. On or about May 1, 2025, Company Defendant breached the Agreement by intentionally impeding and preventing Plaintiff from making the agreed upon ACH withdrawals from the Bank Account while conducting regular business operations.

9. Company Defendant has instructed its bank to stop all payments to Plaintiff under the Agreement in an effort to prevent Plaintiff from obtaining its share of the receivables.

10. In addition, Guarantor agreed to guarantee any and all amounts owed to Plaintiff from Company Defendant upon a breach in performance by Company Defendant.

11. Company Defendant made payments on the Agreement totaling $24,577.00 leaving a balance of $27,259.49. In addition, pursuant to the Agreement, Company Defendant incurred costs and fees of $6,814.87 and a Default fee of $2,500, NSF fees of $300 and a UCC fee of $195, leaving a total balance of $37,069.36 due on the Agreement.

12. Pursuant to the Agreement, Defendants agreed to pay Plaintiff reasonable attorney's fees of up to 40% of the amount claimed.

13. Pursuant to the Agreement, Defendants agreed to pay Plaintiff prejudgment interest of 16% per annum from the date of default.

14. Additionally, Guarantor is responsible for all amounts incurred as a result of Company Defendant' default on the Agreement.

15. There remains a balance due and owing to Plaintiff under the Agreement in the amount of $37,069.36 plus attorney's fees, plus prejudgment interest, plus costs and disbursements.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Breach of Contract**

16. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 15 of this Complaint with the same force and effect as if fully set forth herein.

17. Plaintiff gave fair consideration to Company Defendant which was tendered for the right to receive the aforementioned receivables. Accordingly, Plaintiff fully performed under the Agreement.

18. Company Defendant has materially breached the Agreement by failing to make the specified payment amount to Plaintiff as required under the Agreement and otherwise intentionally impeding and preventing Plaintiff from receiving the proceeds of the receivables purchased by them.

19. By reason of the foregoing, Plaintiff has suffered damages in the amount of $37,069.36 plus attorney's fees, plus prejudgment interest, plus costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Personal Guarantee**

20. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 19 of this Complaint with the same force and effect as if fully set forth herein.

21. Guarantor personally guaranteed that Company Defendant would perform its obligations under the Agreement and that Guarantor would be personally liable for any loss suffered by Plaintiff as a result of Company Defendant' default of its obligations including Plaintiff's reasonable attorney's fees.

22. As stated above, Company Defendant has breached its obligations under the Agreement.

23. By reason of the foregoing, Plaintiff has suffered damages in the amount of $37,069.36 plus attorney's fees, plus prejudgment interest, plus costs and disbursements.

**WHEREFORE**, Plaintiff demands judgement against the Defendants as follows:

i. On the first cause of action of the complaint in the amount of $37,069.36 plus attorney's fees, plus prejudgment interest of 16% from the date of default, plus costs and disbursements; and

ii. On the second cause of action of the complaint in the amount of $37,069.36 plus attorney's fees, plus prejudgment interest of 16% from the date of default, plus costs and disbursements; and

iii. For such other and further relief as this Court deems just and proper.

Dated: May 1, 2025
Cedarhurst, New York

Respectfully Submitted,
**THE LAW OFFICE OF JACOB Z. WEINSTEIN, PLLC**
*Attorney for Plaintiff*

Jacob Weinstein

**JACOB Z. WEINSTEIN**
420 Central Avenue, Ste 301
Cedarhurst, NY 11516
TELEPHONE: (646) 450-3484
FACSIMILE: (646) 661-1772
E-MAIL: Jacob@weinsteinllp.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

HIGHLAND HILL CAPITAL LLC,

Plaintiff,

-against-

**Index No.**

EMJAI LLC / EMJAI / OASIS BOUTIQUE MOTEL / MAXX'S FOOD AND DRINK and MARCUS C CARUSO,

**VERIFICATION**

Defendants.

STATE OF FLORIDA }
ss:
COUNTY OF BROWARD }

1. I Andrew Versace am a manager of the Plaintiff herein and swear to the following:
2. I have read the foregoing VERIFIED COMPLAINT and know that the contents thereof; the same is true to my own knowledge, except as to matters therein alleged to be on information and belief, and as to those matters, I believe them to be true.
3. I affirm that the foregoing statements are true, under the penalties of perjury.

Dated: May 1st, 2025

**ANDREW VERSACE**

Sworn to before me,
this May 1st, 2025.

NOTARY PUBLIC

# Exhibit 9

# Verified Complaint filed by Madison Advance LLC 05-06-2025 in NY State Court (Index No. 515088/2025)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No.:

MADISON ADVANCE LLC,

Plaintiff,

-against-

EMJAI LLC DBA OASIS BOUTIQUE MOTEL and
MAXX'S FOOD AND DRINK and
MARCUS CARUSO ,

Defendants.

**SUMMONS**

Plaintiff's address:
100 Park Ave 16th
Floor
New York, New York 10017

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff attorney, at the address stated below, an answer to the attached complaint. If this summons was personally delivered upon you in the State of New York, the answer must be served within twenty days after such service of the summons, excluding the date of service. If the summons was not personally delivered to you within the State of New York, the answer must be served within thirty days after service of the summons is complete as provided by law.

If you do not serve an answer to the attached complaint within the applicable time limitation stated above, a judgment may be entered against you, by default, for the relief demanded in the complaint, without further notice to you.

Basis for venue: Contractual.

Dated: Lakewood, NJ
May 6, 2025

Nature of this action: breach of contract.
Relief sought: money damages.

Yehuda Klein, Esq.
*Attorney for Plaintiff*
The Klein Law Firm LLC
1820 Swarthmore Ave #714
Lakewood, New Jersey 08701
Phone: (732) 592-1399
Email: jay@thekleinfirm.com

**Defendants to be served:**
EMJAI LLC DBA OASIS BOUTIQUE MOTEL, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332
MAXX'S FOOD AND DRINK, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332
MARCUS CARUSO, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| MADISON ADVANCE LLC,<br>Plaintiff,<br>-against-<br>EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and MARCUS CARUSO ,<br>Defendants. | Index No.:<br>**VERIFIED COMPLAINT** |

Plaintiff MADISON ADVANCE LLC ("Plaintiff"), by its attorney, Yehuda Klein, Esq., for its complaint herein against EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK (collectively, "Company Defendant") and MARCUS CARUSO, ("Guarantor") (Company Defendant and Guarantor shall be collectively referred to as “Defendants”), alleges as follows:

**The Parties**

1. At all relevant times, Plaintiff was and is a Company qualified to do business in and/or organized and existing under the laws of the State of New York.

2. Upon information and belief, at all relevant times, each Company Defendant was and is a company organized and existing under the laws of the State of Nevada.

3. Upon information and belief, at all relevant times, Guarantor was and is an individual residing in the State of Nevada.

4. Upon information and belief, at all relevant times, Individual Guarantor is the owner, principal, and/or manager of each Company Defendant.

**The Facts**

5. On or about March 20, 2025, Plaintiff and Defendants entered into an agreement (the "Agreement") whereby Plaintiff agreed to purchase rights to Company Defendant's future receivables having an agreed upon value of $37,475.00.

6. Pursuant to the Agreement, Company Defendant agreed to exclusively use one bank account approved by Plaintiff (the "Account") into which the Company Defendant agreed to deposit all of its receipts and from which Plaintiff was authorized to make periodic ACH withdrawals until $37,475.00 was fully paid to Plaintiff.

7. The Agreement provided that if: (a) Company Defendant, without Plaintiff's prior authorization, used a bank account other than the Account or closed the Account; (b) Company Defendant failed to give Plaintiff the required advance notice to prevent an ACH withdrawal from being dishonored for insufficient funds; and/or, (c) Plaintiff is otherwise prevented from making any agreed upon ACH withdrawal, the Company Defendant was in default of the Agreement.

8. In addition, Guarantor agreed to guarantee any and all amounts owed to Plaintiff from Company Defendant upon Company Defendant's breach in performance of its Agreement obligations.

9. Plaintiff remitted the purchase price for the future receivables to Company Defendant as agreed and thereby fulfilled all of its Agreement obligations.

10. On or about May 01, 2025, Company Defendant blocked Plaintiff's access to the Account thereby preventing Plaintiff from making the agreed upon ACH withdrawals and, as such, defaulted under the terms of the Agreement.

11. Company Defendant made payments totaling $11,715.00 leaving a balance of $25,760.00.

12. Additionally, Guarantor is responsible for all amounts incurred as a result of any default in the Agreement by Company Defendant.

13. There remains a balance due and owing to Plaintiff on the Agreement in the amount of $25,760.00 plus interest at the statutory rate, costs, disbursements and attorney's fees.

**AS AND FOR THE FIRST CAUSE OF ACTION (Breach of Contract)**

14. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 13 of this complaint as though fully set forth at length herein.

15. Upon information and belief, Company Defendant is still conducting business operations and still collecting receivables.

16. During the course of the Agreement, the unpaid sums became due and payable to Plaintiff, in full as required by Plaintiff or pursuant to the terms of the Agreement in the event of any action constituting a default or breach of any of covenants or warranties contained in the Agreement. Any outstanding balance owed by the Company Defendant at the time of default became immediately due and payable.

17. By reason of the foregoing, Plaintiff has suffered damages in the amount of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees.

**AS AND FOR A SECOND CAUSE OF ACTION (Breach of Guarantee)**

18. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 17 of this complaint as though fully set forth at length herein.

19. Pursuant to the Agreement, Guarantor guaranteed that Company Defendant would perform its obligations thereunder and that Guarantor would be individually, jointly, and severally liable for any loss suffered by Plaintiff as a result of a breach by Company Defendant.

20. Company Defendant has breached the Agreement as detailed above.

21. By reason of the foregoing, Plaintiff is entitled to judgement against Guarantor based on Guarantor's breach of the guarantee in the sum of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees.

**AS AND FOR A THIRD CAUSE OF ACTION (Unjust Enrichment)**

22. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 of this complaint as though fully set forth at length herein.

23. Defendants have been unjustly enriched in that they have received the purchase price for the future receivables, yet have failed to pay the sum of $25,760.00 pursuant to the Agreement.

24. By reason of the foregoing, Plaintiff is entitled to judgment against the Defendants for unjust enrichment in the amount of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees.

**WHEREFORE**, Plaintiff requests judgement against Defendants, jointly and severally, as follows:

**(i)** On the first cause of action of the complaint, Plaintiff requests judgement against each Company Defendant in the amount of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees;

**(ii)** On the second cause of action of the complaint, Plaintiff requests judgement against Guarantor in the amount of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees;

**(iii)** On the third cause of action of the complaint, Plaintiff requests judgement against Defendants in an amount of $25,760.00, plus interest at the statutory rate, costs, disbursements and attorney's fees;

**(iv)** For such other and further relief as this Court deems just and proper.

Dated: Lakewood, NJ
May 6, 2025

Yehuda Klein, Esq.
*Attorney for Plaintiff*
The Klein Law Firm LLC
1820 Swarthmore Ave #714
Lakewood, New Jersey 08701
Phone: (732) 592-1399
Email: jay@thekleinfirm.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No.:

MADISON ADVANCE LLC,

Plaintiff,

-against-

EMJAI LLC DBA OASIS BOUTIQUE MOTEL and
MAXX'S FOOD AND DRINK and
MARCUS CARUSO ,

Defendants.

**VERIFICATION BY A PARTY**

STATE OF NEW YORK, COUNTY OF KINGS

Bianca Kunkel, hereby affirms, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing Complaint is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Bianca Kunkel ,

Bianca Kunkel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| MADISON ADVANCE LLC, Plaintiff,<br>-against-<br>EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and MARCUS CARUSO , Defendants. | Index No.: |

**NOTICE OF ELECTRONIC FILING**
**(Consensual Case)**
**(Uniform Rule §202.5-b)**

**YOU HAVE RECEIVED THIS NOTICE because:**

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

**If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

**The benefits of participating in e-filing include:**

- serving and filing your documents electronically
- free access to view and print your e-filed documents
- limiting your number of trips to the courthouse
- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

**To find legal information to help you represent yourself visit www.nycourthelp.gov.**

**Information for Attorneys**

An attorney representing a party who is served with this notice must either consent or decline consent to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: May 6, 2025

Yehuda Klein, Esq.
*Attorney for Plaintiff*
The Klein Law Firm LLC
1820 Swarthmore Ave #714
Lakewood, New Jersey 08701
Phone: (732) 592-1399
Email: jay@thekleinfirm.com

**To:**
EMJAI LLC DBA OASIS BOUTIQUE MOTEL, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332
MAXX'S FOOD AND DRINK, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332
MARCUS CARUSO, 708 NEVADA WAY, BOULDER CITY, Nevada 89005-2332

Index No. Year: 2025 Hon.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

MADISON ADVANCE LLC,

Plaintiff,

-against-

EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and MARCUS CARUSO ,

Defendants.

**SUMMONS, VERIFIED COMPLAINT and NOTICE OF ELECTRONIC FILING**

**Yehuda Klein, Esq.**
*Attorney for Plaintiff*
*Office and Post Office Address, Telephone*
**The Klein Law Firm LLC**
**1820 Swarthmore Ave #714**
**Lakewood, New Jersey 08701**
**Phone: (732) 592-1399**
**Email: jay@thekleinfirm.com**

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

Dated: May 6, 2025

Yehuda Klein, Esq.

To:

Attorney(s) for

Service of a copy of the within is hereby admitted.

Dated:

Attorney(s) for

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: Jurat

Document Date: 05/06/2025

Number of Pages (including notarial certificate): 10

State of Nevada
County of Clark

Signed and sworn to (or affirmed) before me
on 05/06/2025 by Bianca Kunkel.

Jerry L. Withers

Jerry L. Withers
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 05-99487-1
Expires September 17, 2027

Notarized remotely using audio-video communication technology via Proof.

# Exhibit 10

# Affirmation of Service and Notice of Impending Default Judgment Madison v. Caruso

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No.: 515088/2025

MADISON ADVANCE LLC,

Plaintiff,

-against-

EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and
MARCUS CARUSO ,

Defendants.

**AFFIDAVIT OF SERVICE**

**Ayala Schaffel**, being duly sworn, deposes and says under penalty of perjury, the following:

I am not a party to this action. I am over 21 years of age and on May 8, 2025, I served the within Notice of Impending Default Judgment (the "Notice") pursuant to NY CPLR §3215(g)3(i) by depositing a true copy thereof enclosed in a postpaid envelope(s), in an official depository under the exclusive care and custody of the U.S. Postal Service within Ocean County, New Jersey, addressed to each individual listed in the Notice at the address set forth under his/her name. Each postpaid envelope was marked "Personal and Confidential" and did not indicate that it: (i) concerned an alleged debt; or (ii) was from an attorney.

**Ayala Schaffel**

**NOTARY ACKNOWLEDGMENT**. STATE OF NEW JERSEY, COUNTY OF OCEAN. On May 8, 2025, before me personally appeared **Ayala Schaffel,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

**YEHUDA KLEIN**
NJ Attorney ID: 245572017
A NJ Attorney Is Authorized to Take Acknowledgments Pursuant To
NJ Rev Stat § 46:14-6.1 (2013)

## NOTICE OF IMPENDING DEFAULT JUDGMENT

May 8, 2025

MARCUS CARUSO
708 NEVADA WAY
BOULDER CITY, Nevada 89005-2332

Re: MADISON ADVANCE LLC v. EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and MARCUS CARUSO ,

NYS Supreme Court, KINGS County, Index No.: 515088/2025

**ATTN MARCUS CARUSO**:

Attached hereto is a true and exact copy of the Summons that was, along with a Verified Complaint and a Notice of Commencement of Action Subject to Mandatory Electronic Filing, previously served on you.

This notice is being served upon you pursuant to CPLR 3215.

Yehuda Klein, Esq.
The Klein Law Firm LLC
1820 Swarthmore Ave #714
Lakewood, New Jersey 08701
Phone: (732) 592-1399
Email: jay@thekleinfirm.com

Enclosure

# Exhibit 11

# DocuSign Stipulation of Settlement sent by Alex with Madison's CCED (Client Compliance & Enforcement Division) (unsigned by Plaintiff)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No.: 515088/2025

MADISON ADVANCE LLC,

Plaintiff

-against-

EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK and MARCUS CARUSO ,

Defendants

**STIPULATION OF SETTLEMENT**

The instant action was commenced because of the Defendants' default in the performance of their respective obligations as detailed in a contractual agreement dated March 20, 2025 whereby Plaintiff was to be paid $37,475.00.

**IT IS HEREBY STIPULATED AND AGREED** that this action is settled for the sum of $30,912.00, which sum shall be paid by or on behalf of Defendants to Plaintiff, as follows:

A) Weekly payments of $250.00 on consecutive Mondays, starting on May 12, 2025; then

B) Commencing on May 19, 2025, the weekly payments, will increase to $900.00, and continue weekly at that rate until;

C) Commencing on June 30, 2025, the weekly payments, will increase to $1,250.00 and continue at that rate every consecutive Monday thereafter until Defendants' obligations to Plaintiff hereunder, have been fully satisfied.

If the due date of any payment falls on a bank holiday or weekend, said payment shall be due on the very next workday that is not a bank holiday.

Unless otherwise specifically detailed, all of the above-referenced periodic payments required hereby must be made in accordance with the attached Authorization Agreement for Direct Payments (such document must be properly executed by EMJAI LLC DBA OASIS BOUTIQUE MOTEL and returned simultaneously herewith).

**IN THE EVENT OF A DEFAULT** in any of the above payments or in any of the other terms of this Stipulation of Settlement, Plaintiff shall have the right, without any notice to the Defendants and without further application to the court, to enter judgment for $30,912.00, together with costs, interest and disbursements less any amounts paid hereunder.

After all of Defendants' obligations to Plaintiff as detailed herein have been fully satisfied, Plaintiff shall, within 30 days of the date of a written request from any Defendant, record a Stipulation of Discontinuance with Prejudice with the applicable court and provide Defendants with copy thereof.

**IT IS FURTHER UNDERSTOOD** and agreed that:

1. Plaintiff shall not take any further action or proceedings in the above entitled matter as long as the

Docusign Envelope ID: A9B5C059-295E-4E2A-985C-90C62127046C

Defendants timely make the payments herein provided.

2. As of the date that Defendants' obligations to Plaintiff as detailed herein shall have been fully satisfied, Plaintiff for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Defendants and their respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are directly or indirectly related in any manner to the agreement(s) that gave rise to Defendants obligations as was previously detailed in the instant litigation, including but not limited to any claims that were or could have been asserted. Despite the foregoing, Plaintiff shall not be released from performing its obligations as are detailed in this Stipulation of Settlement. Defendants acknowledge that any and all legal claims they maintain must be brought by a breach of this Stipulation of Settlement. Additionally, Plaintiff is hereby released by Defendants from any and all claims they may have by virtue of Plaintiff's performance of this Stipulation of Settlement.

3. As of the date hereof: (i) Defendants hereby release and forever discharge Plaintiff, their respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are directly or indirectly related in any manner to the Agreement referenced in Plaintiff's Verified Complaint in the instant litigation (the "Agreement"), including but not limited to any claims that were or could have been asserted.

4. Defendants' obligations are conditioned on the fact that, other than if and as described in section A above, there no funds of any Defendants on hold in favor of Plaintiff by way of restraint, lien or any other method. If it becomes known that either: (a) there are currently funds on hold in favor of Plaintiff that Defendants did not disclose to Plaintiff; or (b) subsequent to the date hereof funds become held in favor of Plaintiff, this Stipulation of Settlement SHALL BE DEEMED TO BE AN IRREVOCABLE AUTHORIZATION BY DEFENDANTS TO RELEASE SUCH FUNDS TO PLAINTIFF OR PLAINTIFF'S DESIGNEE. Additionally, Plaintiff shall have the option, if there are currently funds on hold in favor of Plaintiff that Defendants did not disclose to Plaintiff, of deeming considering such non-disclosure to be a

breach of this Stipulation of Settlement.

5. Defendants: (a) acknowledge service of the summons and verified complaint, (b) consent to the jurisdiction of this court, and (c) waive all jurisdictional defenses.

6. The undersigned individual: (a) appears herein; and (b) represents and admits that he/she is not in armed services of the United States.

7. Electronically transmitted copies of this Stipulation of Settlement shall be considered to have the same effect as an original ink-signed document.

Dated: ____________________, 2025

______________________________________
MARCUS CARUSO, Individually and as an authorized officer on behalf of EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK

______________________________________
YEHUDA KLEIN, ESQ.
*The Klein Law Firm, LLC*
1820 Swarthmore Ave #714
Lakewood, NJ 08701
Phone: (732) 592-1399
Email: jay@thekleinfirm.com

**AUTHORIZATION AGREEMENT FOR DIRECT PAYMENTS (ACH DEBITS)** pursuant to a Stipulation of Settlement executed by MARCUS CARUSO as an authorized office on behalf of EMJAI LLC DBA OASIS BOUTIQUE MOTEL and MAXX'S FOOD AND DRINK ("Merchant") on or about the date hereof.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that its Checking Account as detailed below was established for business purposes and not primarily for personal, family or household purposes.

The undersigned, an authorized officer of Merchant, hereby authorizes TKLF LLC and/or MADISON ADVANCE LLC ("Funder") to electronically (ACH) debit the bank account detailed below, as follows:

A) Weekly payments of $250.00 on consecutive Mondays, starting on May 12, 2025; then

B) Commencing on May 19, 2025, the weekly payments, will increase to $900.00, and continue weekly at that rate until;

C) Commencing on June 30, 2025, the weekly payments, will increase to $1,250.00 and continue at that rate every consecutive Monday thereafter until Defendants' obligations to Plaintiff hereunder, have been fully satisfied.

D) Or for any other amount that Merchant or their representative authorizes by phone or email

If the due date of any payment falls on a bank holiday or weekend, said payment shall be ACHed on the very next workday that is not a bank holiday.

Bank Name: ______________________________ Branch: ____________________

ABA Routing #:______________________________ Merchant Tax ID:____________________

Checking Account #:______________________________

**A VOIDED CHECK FROM THE REFERENCED CHECKING ACCOUNT MUST BE ATTACHED HERETO**

MISCELLANEOUS. Neither TKLF LLC nor Funder shall be responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law. After execution, this Authorization may be forwarded to TKLF LLC and/or Funder by email and/or facsimile transmission and each such electronic copy shall be deemed to be an original.

This authorization is to remain in full force and effect until the earlier of: (a) the above-referenced Stipulation of Settlement is fully satisfied; or, (b) TKLF LLC has received written notification from Merchant at least 5 banking days prior of its termination to afford TKLF LLC's depository bank a reasonable opportunity to act on it.

**MERCHANT**, by ______________________________ Date: ____________, 2025
MARCUS CARUSO
Authorized Officer

# Exhibit 12

## Text Message Screenshots from "Alex" at Madison's CCED Pressuring Signature

1:42

Alex Madison Adva...

9:30 AM

Good morning, Alex. I'm just waking up here. I will review "The New Deal" and get it back to you ASAP. Agreed. We will rectify.

9:36 AM SMS

Sounds good, please let me know if you got the email

Text mes...

1:42

Alex Madison Adva...

Marcus, was nice talking with you yesterday we will get through this together with communication. I sent over the agreement with the new account. Please get it back completed as soon as possibl Thanks!

Text mes...

1:42

Alex Madison Adva...

Yes. I'm in receipt.

I would like to check out for the weekend but I need to set up your Monday debit. Please sign it right away. Thanks!

Friday • 12:35 PM

Marcus?

I apolog Alex. I

Text mes...

1:42

Alex Madison Adva...

I apologize Alex. I had just been informed earlier that the account hold had been lifted at one of my major liquor distributors because I was finally able to pay them, and I was permitted to pick up my order so that I could do

Text mes...

1:43

Alex Madison Adva...

so that I could do business tonight. So I ran out the door without checking your email first. As soon as I get home I will give it my undivided attention. I have 32 cases of beer alone to pick up. It's going to be a good weekend now. Sorry for the delay

Text mes...

1:43

Alex Madison Adva...

Friday • 4:08 PM

I'm happy to hear that things are getting better to you. I need that document signed as we agreed on right away I'm doing what I can to help you I need you to do your part.

Have a nice

Text mes...

1:43

Alex Madison Adva...

part.

Have a nice weekend!

Saturday • 8:00 PM

I don't see it signed. You gave me your word. Very soon this will be out of my control and will all be handled by our legal department.

8:00 PM

Text mes...

# Exhibit 13

# Demonstrative Infographic Example: Pattern of Fraud, Coercion, and Judgment Abuse (RICO Framework Summary)


Merchant Cash Advance Litigation Cartel – Lawsuit Volume by Entity (2022–2025)
Invictus Partners
8
Everest Capital (aka EBF Holdings)
1000
Madison Advance
97
Highland Hill Capital
375
0
200
400
600
800
1000
Lawsuit Count
Source: New York State Court Records (NYSCEF) + Trellis.Law

# Exhibit 14

# Madison Advance Contract (includes disguised loan terms and reconciliation clause)

MADISON ADVANCE

PH: 213-247-0597

# Sale of Future Receipts Agreement

This Sale of Future Receipts Agreement ("Agreement") effective, 03/20/25, is made by and between Madison Advance, LLC ("Buyer", "we", or "us"), each Seller identified below ("Seller" or "you"), and each person who signs this Agreement as a Guarantor (each a "Guarantor").

## Seller and Guarantor Information

| Seller Legal Name(s) | D/B/A | Entity type |
|---|---|---|
| EMJAI LLC | OASIS BOUTIQUE MOTEL<br>MAXX'S FOOD AND DRINK | LLC |

| | |
|---|---|
| Primary Seller address | 708 NEVADA WAY BOULDER CITY NV 89005-2332 |
| Primary Contact Person | Name: MARCUS CARUSO<br>Title: Managing Member<br>Address: 708 NEVADA WAY BOULDER CITY NV 89005-2332<br>Phone: 702-287-0513<br>Email: emjaillc@gmail.com |
| Guarantor(s) | MARCUS CARUSO |

## Purchase Information

The transaction contemplated by this Agreement is a purchase of Future Receipts. "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automated Clearing House ("ACH") or other electronic transfer; (b) payments, or rights to payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); (c) accounts and payment intangibles; and (d) payments made by any other form. You will deliver the entire Purchased Amount of Future Receipts to us over time by allowing us to debit the Periodic Amount (which is subject to adjustment) on each Remittance Day. We will debit the Periodic Amount from one or more deposit accounts authorized by you for this purpose (each, an "Authorized Account").

**Purchased Amount of Future Receipts**
$ 37,475.00

**Purchase Price**
$ 25,000.00

**Periodic Amount**
$ 2,343.00

**Specified Percentage**
13 %

**How we calculated the Periodic Amount**

The Periodic Amount is the Specified Percentage of the average sales revenue we estimate you will receive. Our estimate is based on a review of your past revenue. We used information you provided to us to make this estimate. Beginning on the first Remittance Day, the Periodic Amount will be the amount identified on this page. You have the right to adjust the Periodic Amount to better reflect actual revenue as it changes over time. Please refer to Section 4 (Reconciliation Process) to learn how you can adjust the Periodic Amount.

**Remittance Days will occur (The option marked ■ applies):**

☐ Every Week Day (i.e., Monday through Friday)
■ Weekly*
☐ Monthly*

*We will notify you of the day or days on which each Remittance Day will occur.

**Amounts Deducted from Purchase Price:**

| | |
|---|---|
| Prior balance paid to Buyer | $ |
| Prior balance paid to third parties | $ |
| Origination fee | $ 1,750.00 |
| Total Amount Deducted From Purchase Price | $ 1,750.00 |
| **Net Funded Amount** | $ 23,250.00 |

This is the Purchase Price minus the Total Amount Deducted from Purchase Price. This is the total dollar amount of funds to be deposited into your Authorized Account.

1. **Sale of Future Receipts.** Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above. As payment for the Purchased Amount, Buyer agrees to pay Seller the Purchase Price shown above and Seller will receive funds equal to the Net Funded Amount.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Funded Amount, shown above, into any Authorized Account. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to any Authorized Account and the ability to withdraw the initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** If Remittance Days are to occur on a frequency other than other than daily, then Buyer will notify Seller on or before the date Buyer has accepted this Agreement, of the day of the week or month (as applicable) on which Remittance Days will occur. The Purchased Amount will be delivered to Buyer each Remittance Day in a series of remittances each equal to the Periodic Amount. Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount or, following any adjustment pursuant to Section 4 (Reconciliation Process), the adjusted Periodic Amount. For this purpose, Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer. Seller agrees not to change any account information without prior written consent from Buyer. If a Remittance Day occurs on a bank holiday, Seller authorizes Buyer to initiate a debit entry on the next day on which Seller's bank is open in an amount equal to the Periodic Amount and, if Remittance Days are scheduled to occur every Week Day, Buyer may initiate the debit entry in an amount equal to the Periodic Amount scheduled for the next day, plus the Periodic Amount that would have been debited on the preceding bank holiday.

4. **Reconciliation Process (IMPORTANT PROTECTION FOR SELLER).** The Periodic Amount is based on an estimate of the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer have the right to require a new review of Seller's revenue for the purpose of evaluating whether the Periodic Amount continues to accurately reflect the Specified Percentage of Seller's actual revenue for the period reviewed (a "reconciliation").

   a. **How Seller may Request a Reconciliation**. Seller may request a reconciliation by calling Buyer at 213-247-0597 or sending an email to reconciliation@madisonadvance.com.

   b. **How Buyer may Request a Reconciliation.** Buyer may request a reconciliation in writing via regular mail or e-mail.

   c. **Reconciliation Review.** After receiving or making a request for reconciliation pursuant to this Agreement, Buyer shall calculate Seller's average revenue for the 60-day period preceding the reconciliation request (the "Review Period"). Seller shall cooperate with any reconciliation by providing bank statements or other records of Seller's actual revenue received during the Review Period ("Reconciliation Information"). Reconciliation Information may be provided electronically. Seller shall also provide Buyer with any assistance or other information needed to access or view any Reconciliation Information. Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than 3 calendar days following such receipt) calculate whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an "excess") or less than the Specified Percentage of Seller's actual revenue during the Review Period (a "shortfall").

   d. **Adjusting the Periodic Amount.** If there was an excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day. If there was a shortfall, then Buyer may (but is not required to) increase the Periodic Amount for each subsequent Remittance Day. In either case, Buyer shall adjust the Periodic Amount to an amount equal to the Specified Percentage of Seller's reasonably anticipated average revenue, based on the Reconciliation Information. After an adjustment, the Periodic Amount shall remain unchanged until a subsequent adjustment occurs in accordance with this Section.

   e. **Failure to Provide Reconciliation Information.** If Seller requests a reconciliation and fails to provide the Reconciliation Information within 10 calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within 10 calendar days after Buyer's reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.

5. **Changing the Remittance Day.** The parties may change the frequency of the Remittance Day pursuant to this Section. The effective date of any change to the Remittance Day is referred to herein as the "Change Effective Date". Any change to the Remittance Day will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Day and calculation of the Periodic Amount is described below.

   a. Changing Remittance Day to occur each Week Day. Either Buyer or Seller may request that a weekly or monthly Remittance Day be changed to occur on each Week Day. The party requesting a change must notify the other party in accordance with Section 19 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, divided by five (in the case of a change from a weekly Remittance Day) or twenty (in the case of a change from a monthly Remittance Day).

   b. Changing Remittance Day to occur weekly or monthly. When the Remittance Day is scheduled to occur each Week Day, the Remittance Day may be changed to occur weekly or monthly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the day each Remittance Day will occur. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, multiplied by five (in the case of a change to a weekly Remittance Day) or twenty (in the case of a change to a monthly Remittance Day).

   c. Effect on reconciliation. Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 4 (Reconciliation Process) shall account for the change in the frequency of the Remittance Day as described above.

6. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount and Seller retains no legal or equitable interest therein.

7. **Fees and Charges.** The fees and charges owed by Seller are as described in this Agreement. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer. In addition to the Origination Fee that has been deducted from the Purchase Price, and except as prohibited by applicable law, Seller agrees to pay the following fees and charges described below:

   a. Returned/Rejected Entry Fee. If any ACH entry, check, or electronically created item is returned for insufficient funds or rejected for any other reason, then Seller will pay Buyer a returned/rejected entry fee of $35. In addition, Seller will reimburse Buyer for any charges incurred by Buyer resulting from the returned ACH entry, check, or electronically created item. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement.

   b. Account Change Request Fee. If Seller wishes to obtain Buyer's consent to make any change to any Authorized Account, then Seller must submit such request in writing in accordance with Section 17 (Notices) and pay a fee of $50, except where prohibited by law. Seller agrees the Account Change Request Fee compensates Buyer for its reasonable cost to evaluate the potential risk to Buyer created by the requested change.

   c. Transaction Fee. Seller shall pay a transaction fee of $295 per month until the full Purchased Amount is delivered to Buyer.

8. **Early Delivery Option.** If this Agreement contains an Early Delivery Schedule, then Seller may at its option elect to pay the remaining balance of the Purchased Amount to Buyer on an accelerated basis in a discounted amount described in the Early Delivery Schedule attached to this Agreement (the "Early Delivery Option"). The Early Delivery Option is subject to any conditions identified in the Early Delivery Schedule.

**9. Credit Report and Financial Information Authorizations.**

a. Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its owners, and (iii) to contact personal and business references provided by Seller to Buyer, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

b. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

c. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

**10. Authorization to Contact Current and Prior Banks.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement. Seller hereby further authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collection purposes and in order to confirm that Seller is exclusively using an Authorized Account for the deposit of all Future Receipts of the Seller.

**11. Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within 3 calendar days after Buyer has delivered the Net Funded Amount to Seller. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and paying to Buyer the following amount in immediately available U.S. funds: (a) the Net Funded Amount, and (b) any portion of the Purchase Price that was advanced to third parties. Seller's right to cancel shall be effective only if Buyer receives both the notice and the required payment no later than 5:00 PM Eastern Time on the third calendar day following the date on which Seller received the Net Funded Amount.

**12. Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

**13. Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received the Purchased Amount and all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

a. **No Interference.** Seller must deposit all Future Receipts into an Authorized Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into an Authorized Account on a daily basis. Seller agrees not to (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or, (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller.

b. **Stacking Prohibited.** Seller shall not, without Buyer's prior written consent, enter into: (a) any other agreement for the sale of Future Receipts, or (b) any loan agreement that encumbers Seller's Future Receipts or requires daily payments. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial

condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

d. **Compliance with Law and Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. As of the date of this Agreement, Seller does not plan to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement: (a) Seller has not filed, and does not plan to file, any petition for bankruptcy protection under Title 11 of the United States Code, (b) there has been no involuntary petition brought or pending against Seller, and (c) Seller has not received any communication from any third party indicating that an involuntary petition will be filed against Seller. Seller has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement. Seller further warrants that, as of the date of this Agreement, it does not plan to engage the services of a debt relief organization.

h. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes and other assessments, including but not limited to employment, sales and use taxes.

i. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement does not conflict with and will not violate any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.** Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

l. **Seller as a Commercial Entity.** Seller is a sophisticated business entity familiar with the type of transaction described under this Agreement, and has had a full opportunity to consult with counsel of their choice, and has consulted with counsel or has decided not to avail themselves of that opportunity.

**14. Rights of Buyer.**

a. **Acknowledgment of Security Interest and Security Agreement.** The sale of Future Receipts pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale from Seller to Buyer, conveying good title to the Future Receipts free and clear of any liens and encumbrances. To the extent the Future Receipts include any "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in

which the Seller is located ("UCC") then: (i) the sale of such accounts or payment intangibles creates a security interest as defined in the UCC, (ii) this Agreement constitutes a security agreement under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit any Authorized Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that, with respect to any authorization provided by Seller to permit Buyer to initiate ACH debit or credit entries to an Authorized Account ("ACH Authorization"): (i) each Authorized Account is solely owned by Seller; (ii) any person executing an ACH Authorization on behalf of Seller is an authorized signer on the Authorized Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Authorized Account, and (iii) the Authorized Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH entry is rejected by Seller's bank for any reason other than a stop payment order placed by Seller with its bank, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH entry that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any ACH entry, Seller authorizes Buyer to initiate ACH entries to the applicable Authorized Account to correct the error. Seller acknowledges that the origination of ACH entries to and from an Authorized Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH entry initiated pursuant to an ACH Authorization, provided the entry corresponds to the terms of the ACH Authorization. Seller requests the bank that holds the Authorized Account honor all ACH entries initiated in accordance with an ACH Authorization.

15. **Remedies for Seller's Breach of this Agreement.** If Seller violates or fails to comply with any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. Buyer may increase the Specified Percentage to 100% and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. Buyer may enforce the provisions of the Guaranty of Performance against each Guarantor.

d. Buyer may require Seller to pay Buyer all reasonable costs associated with Seller's breach. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

e. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

f. Subject to the arbitration provisions of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

16. **Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

17. **Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

18. **Multiple Sellers.** If more than one person or entity is listed as a Seller above, then the term "Seller" refers collectively to all Sellers who have signed the signature page of this Agreement. The term "Future Receipts" refers to the Future Receipts of each Seller and the calculation of the initial Periodic Amount and any adjustment to the Periodic Amount shall be based on an aggregate of the actual or projected sales revenue of all the Sellers. Each Seller agrees that Buyer's purchase of Future Receipts hereunder constitutes a purchase of the Future Receipts of all the Sellers. Each Seller agrees that it is jointly and severally liable to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts. Each Seller agrees that the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount. Each Seller designates the Primary Contact Person identified above as its authorized representative for all purposes related to this Agreement and any related transactions. Buyer may treat any notice or instruction received from the Primary Contact Person as a notice or instruction from all Sellers.

19. **Notices.**

a. **Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller and Guarantor (as applicable) by regular mail or (at Buyer's option) by e-mail to the Primary Contact Person. Seller and each Guarantor agrees that the Primary Contact Person is authorized to receive all communications on behalf of Seller and each Guarantor. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to the Primary Contact Person at the address set forth above or such new address communicated by the Primary Contact Person to Buyer pursuant to this Section.

b. **Notices from Seller and Guarantor.** Unless another method of notice to Buyer is specifically described in this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer at 100 Park Ave 16th Floor New York, NY 10017. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20. **Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that neither Seller nor Guarantor shall have the right to assign its respective rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regard to any applicable principles of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Each Seller and Guarantor agrees that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, each Seller and Guarantor waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Unless prohibited by law, Buyer, Seller and Guarantor further agree that the mailing by certified or registered mail, return receipt requested, of any process

Madison Advance

required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

21. **Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

22. **Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against Buyer as drafter.

23. **Entire Agreement and Severability.** This Agreement embodies the entire agreement among Seller, Guarantor, and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

25. **Authorization to Contact.**

   a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

   b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

26. **JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

27. **CLASS ACTION WAIVER. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE**

Docusign Envelope ID: 81CBB435-608E-4085-8A2F-22393331436B

**PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**28. ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

**29. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: 100 PARK AVE 16TH FLOOR NEW YORK, NY 10017 ATTENTION: ARBITRATION OPT-OUT.**

**GUARANTY OF PERFORMANCE – Each of the undersigned Guarantors agrees to the following terms:**

**30. Guaranteed Obligations.** Guarantor agrees to irrevocably, absolutely, and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

a. Seller's obligation to not (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller;

b. Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

c. Seller's obligation to not change any of its places of business without prior written consent by Buyer;

d. Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

e. Seller's obligation to not enter into any other agreement for the sale of Future Receipts, or any loan agreement that encumbers Seller's Future Receipts or requires daily payments with any party other than Buyer without Buyer's prior written consent for the duration of this Agreement; and

f. Seller's obligation to provide truthful, accurate, complete and timely information as required by this Agreement.

31. **Guarantor Waivers.** Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Guaranty of Performance: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Guaranty of Performance. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Guaranty of Performance: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

32. **Guarantor Acknowledgement**. Each Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the following Sections: Credit Report and Financial Information Authorizations; Notices; Binding Effect, Governing Law, Venue and Jurisdiction; Authorization to Contact Jury Waiver; Class Action Waiver; and Arbitration and Right to Opt Out of Arbitration.

MADISON ADVANCE

Docusign Envelope ID: 81CBB435-608E-4085-8A2F-22393331436B

**Signature Page to Sale of Future Receipts Agreement**

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Seller: EMJAI LLC
By: Signed by: [signature] 17FCB9D0BE55462... (signature)
Name: MARCUS CARUSO
Title: Managing Member

Seller: N/A
By: ______ (signature)
Name: N/A
Title: N/A

Seller: N/A
By: ______ (signature)
Name: N/A
Title: N/A

Seller: N/A
By: ______ (signature)
Name: N/A
Title: N/A

**Agreement of Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Notice: This Agreement contains a guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of the Guaranteed Obligations as described in the GUARANTY OF PERFORMANCE section above.

Guarantor Name: MARCUS CARUSO
By: Signed by: [signature] 17FCB9D0BE55462... (signature)

Guarantor Name: N/A
By: ______ (signature)

MADISON ADVANCE

# AUTHORIZATION AGREEMENT
# FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

This Authorization Agreement is provided to Madison Advance, LLC ("Buyer") by each Seller identified on the Signature Page to this Authorization Agreement. This Authorization Agreement is provided pursuant to the Sale of Future Receipts Agreement (the "Sale Agreement") entered into between such Seller and the Buyer. Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Sale Agreement.

By signing this Authorization Agreement, each Seller agrees to the following:

Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified on the Signature Page to this Authorization Agreement in the amount of any Periodic Amount due on a Remittance Day, or any other amount due to Buyer from Seller (or otherwise authorized to be debited) under the terms of the Sale Agreement, as it may be amended, supplemented or replaced from time to time. Seller acknowledges that each such identified account is an "Authorized Account" as defined in the Sale Agreement. Seller also authorizes Buyer to initiate credit entries to deliver the Net Funded Amount to Seller and authorizes Buyer to initiate additional entries (debits and credits) to any Authorized Account to correct any erroneous transfers.

If Seller breaches the Sale Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Sale Agreement.

Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Authorized Account and to correct any missing, erroneous or out-of-date information.

Seller represents and warrants that each Authorized Account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha. Seller understands and agrees that any revocation or attempted revocation of this Authorization Agreement will constitute a breach of the Sale Agreement. In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

Seller understands that the Authorization Agreement is a fundamental condition to induce Buyer to enter into the Sale Agreement. Consequently, this Authorization Agreement is intended to be irrevocable during the course of the Sale Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Sale Agreement.

[Signature Page follows]

MADISON ADVANCE

Docusign Envelope ID: 81CBB435-608E-4085-8A2F-22393331436B

## Signature Page to Authorization Agreement

By signing below, each Seller represents that it is the holder of the account identified immediately above its signature, and agrees that such account is an "Authorized Account" account as described in the Authorization Agreement.

| | |
|---|---|
| Account Name: | EMJAI LLC |
| Bank Name: | WELLS FARGO BANK |
| ABA Transit/Routing Number: | 321270742 |
| Account Number: | 2129533804 |
| Seller Signature | EMJAI LLC<br>Signature: [signature] Signed by: 17FCB9D0BE55462...<br>Name: MARCUS CARUSO<br>Title of signer: Managing Member |

| | |
|---|---|
| Account Name: | N/A |
| Bank Name: | N/A |
| ABA Transit/Routing Number: | N/A |
| Account Number: | N/A |
| Seller Signature | N/A<br>Signature:<br>Name: N/A<br>Title of signer: |

| | |
|---|---|
| Account Name: | N/A |
| Bank Name: | N/A |
| ABA Transit/Routing Number: | N/A |
| Account Number: | N/A |
| Seller Signature | N/A<br>Signature:<br>Name: N/A<br>Title of signer: N/A |

| | |
|---|---|
| Account Name: | N/A |
| Bank Name: | N/A |
| ABA Transit/Routing Number: | N/A |
| Account Number: | N/A |
| Seller Signature | N/A<br>Signature:<br>Name: N/A<br>Title of signer: N/A |

MADISON ADVANCE

## Bank Login Information

Madison Advance, LLC will require viewing access to your bank account, prior to funding, as part of our underwriting process. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

| | |
|---|---|
| **Bank Name** | Well Fargo |
| **Bank Portal Website** | www.wellsfargo.com |
| **Username** | Geno_2018 |
| **Password** | ONyou74! |

## Emergency Contacts

Madison Advance LLC requires four valid emergency contacts to receive funding.

| | |
|---|---|
| Name | N/A |
| Relation | N/A |
| Phone Number | N/A |
| Email Address | N/A |

| | |
|---|---|
| Name | N/A |
| Relation | N/A |
| Phone Number | N/A |
| Email Address | N/A |

| | |
|---|---|
| Name | N/A |
| Relation | N/A |
| Phone Number | N/A |
| Email Address | N/A |

| | |
|---|---|
| Name | N/A |
| Relation | N/A |
| Phone Number | N/A |
| Email Address | N/A |

# Exhibit 15

# Notice from Shift 4 – Credit Card Processor Regarding UCC Lien for (Highland Hill Capital LLC)

SHIFT4

**May 13, 2025**

MARCUS CARUSO
**EMJAI, LLC**
708 NEVADA WAY
BOULDER CITY, NV 89005

**RE: EMJAI, LLC d/b/a MAXXS FOOD & DRINK 0021671196**

Hello,

This letter serves as a courtesy notice that Shift4 Payments, LLC is in receipt of a **UCC Lien** notice from **Omega Capital on behalf of Highland Hill Capital LLC** giving right to withholding funds from **EMJAI, LLC** in relation to your merchant account with Shift4 Payments.

Shift4 Payments is obligated by law to abide by the terms of the **UCC Lien** notice, and you have granted Shift4 Payments the right to do so. Specifically, the Merchant Processing Agreement, which you signed, you agreed to hold harmless and indemnify Shift4 Payments for any act or omission which violates any laws, card brand rules, or the rights of another person or otherwise injures any third party.

Be advised that within seven (7) days of the date of this letter, Shift4 Payments will place a hold on your merchant account, in accordance with the instructions provided in the **UCC Lien**. If you dispute the **UCC Lien**, please provide all documentation in support of that assertion as soon as possible for Shift4 Payments review. You can contact the 3rd party for details via any of the following methods.

**Omega Capital on behalf of Highland Hill Capital LLC**
420 Central Avenue, Ste 301, Cedarhurst, NY 11516
(646) 450-3484

In the event that we do not hear back from you or the 3rd Party, or if you provide no supporting documentation in dispute of the **UCC Lien**, Shift4 Payments will comply with all additional court-ordered mandates, including ultimately disbursing the held funds to **Omega Capital on behalf of Highland Hill Capital LLC.**

This letter is made without prejudice to any rights or remedies that may be available to Shift4. Nothing contained herein should be deemed a waiver or admission by Shift4 and/or Shift4 Payments. Shift4 and/or Shift4 Payments expressly reserves the right to assert any factual or legal positions as additional facts come to light, or as the circumstances warrant.

Regards,
Legal Support

# Exhibit 16

# Wells Fargo Statement
# (includes several references noted on statement)

WELLS FARGO

## Statement period activity summary

| | |
|---|---|
| Beginning balance on 3/1 | [redacted] |
| Deposits/Credits | [redacted] |
| Withdrawals/Debits | [redacted] |
| **Ending balance on 3/31** | [redacted] |

Account number: [redacted] **(primary account)**

[redacted]

**DBA OASIS BOUTIQUE MOTEL**
**DBA MAXX'S FOOD AND DRINK**

*Nevada account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): [redacted]

For Wire Transfers use
Routing Number (RTN): [redacted]

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

## Interest summary

| | |
|---|---|
| Interest paid this statement | $0.01 |
| Average collected balance | $806.70 |
| Annual percentage yield earned | 0.00% |
| Interest earned this statement period | $0.00 |
| Interest paid this year | $0.02 |
| Total interest paid in 2024 | $0.03 |

## Transaction history

| *Date* | *Check Number* | *Description* | *Deposits/ Credits* | *Withdrawals/ Debits* | *Ending daily balance* |
|---|---|---|---|---|---|
| [redacted] | | [redacted] | [redacted] | | [redacted] |
| [redacted] | | [redacted] | | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | | |
| [redacted] | | [redacted] | [redacted] | | |
| 3/20 | | Zelle to Signet on 03/20 Ref #Rp0Ymv5Wgg First Fee Installment | | 5,000.00 | [redacted] |
| [redacted] | | [redacted] | | [redacted] | |
| [redacted] | | [redacted] | | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| **Totals** | | | $[redacted] | [redacted] | |

PINK IS ZELLE PAYMENTS TO SHAWN "AJ" CHAIT @ SIGNET FOR FINDERS FEE FOR $140,000 FAKE LOAN

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

**Monthly service fee summary**

For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 03/01/2025 - 03/31/2025 | Standard monthly service fee $25.00 | You paid $25.00 |
|---|---|---|

WELLS FARGO

**_Transaction History (continued)_**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 3/20 | | WT Fed#03788 Optimumbank /Org=Madison Advance LLC Srf# 0670150960187350 Trn#250320191266 Rfb# Emjai | 23,250.00 | | |
| [redacted] | | [redacted] | [redacted] | [redacted] | |
| 3/20 | | Online Transfer to Caruso M Ref #Ib0Rq6Lm3P Everyday Checking Third Fee Installment. | | 2,540.00 | |
| [redacted] | [redacted] | [redacted] | | [redacted] | |
| 3/20 | < | Business to Business ACH Debit - Ebf Holdings 8006192943 250319 191068 Emjai LLC | | 1,800.00 | [redacted] |
| [redacted] | | [redacted] | [redacted] | | |
| 3/21 | | Highlandhillcap Rpmt-1820 250320 Week 1 Emjai, LLC | 8,212.92 | | |
| [redacted] | | [redacted] | | [redacted] | |
| 3/21 | | Zelle to Signet on 03/21 Ref #Rp0Ymx3B5B 2nd Fee Installment. | | 5,000.00 | |
| [redacted] | [redacted] | [redacted] | | [redacted] | |
| 3/21 | < | Business to Business ACH Debit - Highland Hill CA 9549478724 250320 (954) 947-8724 Emjai LLC DBA Oasis Bo | | 1,169.00 | |

RED IS NEW FRACTIONAL WEEKLY DEPOSIT & IMMEDIATE DAILY WITHDRAWAL
PINK IS ZELLE PAYMENTS TO SHAWN "AJ" CHAIT @ SIGNET FOR FINDERS FEE FOR $140,000 FAKE LOAN
ORANGE IS NEW LOAN FROM MADISON ADVANCE TO COVER AJ'S 12,500 FINDER FEE DEMAND