KAEMPFER CROWELL
Louis M. Bubala III, Bar No. 8974
50 W. Liberty Street, Suite 1100
Reno, Nevada 89501
Telephone:  (775) 852-3900
Facsimile:   (775) 327-2011
E-Mail: lbubala@kcnvlaw.com

KAEMPFER CROWELL
Isabella Goldsmith, Bar No. 16870
1980 Festival Plaza Drive, Suite 650
Las Vegas, Nevada 89135
Telephone:  (702) 792-7000
Facsimile:  (702) 796-7181
Email: igoldsmith@kcnvlaw.com

*Attorneys for Defendants Highland Hill
Capital, LLC Andrew Versace, Scott Federico,
and Tristan Bloom*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARCUS CARUSO,<br><br>        Plaintiff,<br><br>vs.<br><br>MADISON ADVANCE LLC, HIGHLAND HILL CAPITAL, LLC, ANDREW VERSACE, SCOTT FEDERICO, TRISTAN BLOOM, GLENN BERMAN, SIGNET CAPITAL GROUP LLC, and AJ CHAIT,<br><br>        Defendants. | Case No. 2:25-CV-00888-APG-MDC<br><br>**OPPOSOTION TO:**<br>**--MOTION FOR TEMPORARY RESTRAINING ORDER [DKT. 6] AND**<br>**--MOTION FOR PRELIMINARY INJUNCTION [DKT. 7];**<br><br>**AND**<br><br>**CROSS-MOTION TO DISMISS FOR IMPROPER VENUE**<br><br>**Hearing Date: June 20, 2025**<br>**Hearing Time: 2:00 p.m.**<br>**Hearing Location: Courtroom 6C**<br>        **Lloyd D. George U.S.**<br>        **Courthouse**<br>        **333 Las Vegas Blvd. S.**<br>        **Las Vegas, NV 89101** |

KAEMPFER
CROWELL

Defendants Highland Hill Capital, LLC ("HHC"), Andrew Vercace, Scott Federico, and Tristan Bloom (collectively, the "HHC Defendants") submit this memorandum of law in opposition to the motions made by Plaintiff Marcus Caruso ("Plaintiff" or "Caruso") seeking a temporary restraining order and preliminary injunction, and in support of the HHC Defendants' cross-motion to dismiss this action based on improper venue.

## FACTS

Plaintiff is the owner of Emjai LLC d/b/a Maxx's Food & Drink and Oasis Boutique Motel ("Emjai"). Caruso Decl. at ¶ 1. Emjai is not a party to this action. Between December 2024 and March 2025, Emjai entered in several merchant cash advance ("MCA") financing arrangements with different MCA companies. Complaint at ¶ 17. In a typical MCA financing, the financing company (the buyer) provides the merchant (the seller) with an upfront cash advance for the purchase of a set dollar amount of future receivables. The merchant remits the purchased receivables to the MCA company over time based on a set percentage of the merchant's actual business receipts as they are collected. If the merchant does not generate sufficient receivables, it has no repayment obligation.

As is more fully set forth in the accompanying Declaration of Scott Federico (the "Federico Decl."), attached as Exhibit 1, in March 2025, HHC, an MCA financing company, was introduced to Emjai and Mr. Caruso through Defendant Signet Capital Group LLC ("Signet"), an unaffiliated third-party broker that refers merchants seeking financing to HHC. During the underwriting process, Mr. Caruso provided HHC with monthly bank statements reflecting $850,000 in yearly revenues. Federico Decl. at ¶ 6. HHC then offered to provide Emjai with a "reverse consolidation," whereby HHC would provide Emjai with financing through weekly installments for the purpose of paying the balances due on the pre-existing MCA agreements. HHC's offer was accepted through Caruso's execution of a Standard Merchant Cash Advance Agreement, dated

KAEMPFER
CROWELL

March 20, 2025 (the "Merchant Agreement"), a copy of which is annexed to the Federico Decl. at Exhibit A.

Pursuant to the Merchant Agreement, HHC purchased up to $222,645.28 (the "Purchased Amount") of future Receivables from Emjai for an upfront purchase price of $148,529.21 (the "Purchase Price") less disclosed underwriting and ACH program fees of $7,426.46, resulting in potential Net Funds of $141,102.75. *Id*. at p. 1 and p. 2 at ¶ 2. Upon receiving HHC's advance, Emjai was required to deposit all its Receivables in a designated bank account (the "Account") and to remit 35% of its daily receivables (the "Specified Percentage") to HHC until the Purchased Amount was remitted in full. In the interim, Emjai authorized HHC to ACH debit the amount of $1,169.00 each business day (the "Initial Daily Payments") as an estimate of the Specified Percentage. *Id*. at p 1 and p. 22 (Authorization To Initiate ACH Debit Entries).

As was explained to Mr. Caruso prior to funding (Federico Decl. at ¶ 7), the Merchant Agreement contemplated a weekly installment system whereby the Net Funds would be paid to Emjai on a pro-rated basis over a twenty-five week period, so as to ensure that Emjai was utilizing the cash advances for their intended purpose and otherwise honoring the terms of the agreement. This weekly system is conspicuously set forth in the Disbursement Schedule (Addendum to Secured Merchant Agreement) annexed to the Federico Decl. at Exhibit B. Specifically, Paragraph 7 of the Disbursement Schedule, which Mr. Caruso separately signed, identifies the "installment" amount to be advanced to Emjai and the corresponding pro-rated portion of the Receivables being purchased by HHC. Thus, for example, in Week 1, HHC advanced $8,212.92 for the purchase of $12,959.12 in potential future receivables, to be remitted back to HHC through the Initial Daily Payments. The same process would continue each week.

Critically, and contrary to the central allegation in the Complaint, HHC was afforded the right to terminate the weekly installments in the event of a breach by Emjail. Thus, Paragraph 5

KAEMPFER
CROWELL

of the Disbursement Schedule clearly provides:

> <u>Right to Terminate</u>. HHC reserves the right to terminate its obligation to make the weekly Disbursements at its option at any time after HHC determines that there was: (i) Any Event of Default, as defined in the Agreement and/or in this Addendum; (ii) Merchant fails to provide to HHC a monthly Account statement, access codes to the Online Login Account, updated accounts receivable ledgers or a snap shot of the Merchant's bank statements, (iii) Merchant breaches the Stacking provision set forth in Section 2 hereunder, (iv) Merchant has a negative balance with HHC or payments that have not cleared due to insufficient funds, (v) any other breach of the Agreement.

Federico Decl. at Ex. B, ¶ 5.

In such a case, Emjai would only be responsible for remitting the pro-rated portion of the Purchased Amount. *Id*. at ¶ 6. For example, as the chart in Paragraph 7 of the Disbursement Schedule indicates, if advances were terminated after Week 4, the Purchased Amount would be $51,836.49. There was never a "phantom" offer of $140,000 in guaranteed financing and, contrary to Plaintiff's Ex. 7, never a scheme to obtain a $137,220.83 default judgment. Rather, financing was contingent on Emjai complying with its continuing remittance obligations.

As is also dispositive of Plaintiff's motion, Section 4 of the Merchant Agreement provided Emjai with a right of reconciliation (or true up) of Initial Daily Payments based on actual Receivables. *Id*. at Ex. A at 3, ¶ 4. *See also* p. 19 (Addendum). Section 7 confirms that the "term" of the Merchant Agreement is "indefinite." Finally, Emjai's bankruptcy would not trigger a contractual default. *Id*. at p. 5, ¶ 15. These factors make repayment contingent on the merchant's generation of receivables as opposed to fixed. As the Merchant Agreement explains:

> <u>Sale of Receivables</u>. Each Merchant and HHC agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HHC to any Merchant. HHC is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in HHC not receiving the Receivables Purchased Amount. Any Merchant going bankrupt or going out of business or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement. Each Merchant agrees that the Purchase Price in exchange for the

KAEMPFER
CROWELL

Receivables pursuant to this Agreement equals the fair market value of such Receivables. HHC has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to HHC in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

*Id*. at p. 5, ¶ 15.

On March 21, 2025, HHC began making weekly remittances of $8,212.92 under the Disbursement Schedule. Federico Decl. at Ex. C. Concomitantly, HHC commenced debiting the Initial Daily Payments from Emjai's Account. Federico Decl. at Ex. D. This process continued for three additional weeks, during which time Emjai bounced several remittances. *Id*. However, the ACH debit HHC initiated on April 18, 2025, was rejected by reason of a stop payment placed by Mr. Caruso. *Id*. This is the equivalent of writing a bad check and a clear event of default under the Merchant Agreement. Federico Decl. at Ex. A, p. 7, ¶ 32(7).

HHC worked with Mr. Caruso in good faith and agreed to lower the Initial Daily Payments by 70% to $399.00 (the "Reduced Daily Payments") on condition that he unblock the debits and not further breach the Merchant Agreement. Federico Decl. at ¶ 16. Mr. Caruso agreed and signed the Request to Un-Block Previous Unauthorized Account, annexed to the Federico Decl. at Exhibit E. Nevertheless, only days later, Mr. Caruso again placed a stop payment on HHC's debits of the Reduced Daily Payments, thereby materially breaching the Merchant agreement again, and ghosted HHC. Federico Decl. at ¶ 19-20. Accordingly, pursuant to its clear rights under the Disbursement Schedule, HHC ceased making weekly disbursements. *Id*.

On May 1, 2025, HHC commenced a suit in New York state court against Emjai and Caruso for breach of the Merchant Agreement and accompanying personal guaranty of performance. That

KAEMPFER
CROWELL

lawsuit resulted in the entry of a default judgment against Emjai and Caruso for **$38,183.37**, based on the pro-rated Purchased Amount of $51,836.49 less $24,577.00 in initial remittances, plus 25% in liquidated damages and default and NSF fees.  Federico Decl. at Ex. G.  Mr. Caruso does not dispute receiving timely and proper notice of the New York action and, in fact, attaches a copy of the New York Complaint to his motion.  The judgment roll in the New York action reflects that Emjai **netted approximately $8,000.00** by breaching the Merchant Agreement.

Plaintiff has also named Madison Advance LLC ("Madison") as an additional defendant in this action, alleging that on March 20, 2025 (the same day it obtained financing from HHC), Emjai obtained also additional financing through its sale of future receivables to Madison. Plaintiff's Exhibit Index at p. 81 (Madison Sale of Future Receipts Agreement).  According to the Madison agreement, Madison advanced $23,250.00 to Emjai which Mr. Caruso claims was then used to pay an individual named "AJ" Chait, who is named as a Defendant herein and worked at Signet, his brokerage fee.  Emjai then also breached the Madison agreement by blocking Madison's debits.  *Id*. at p. 59.

Madison is not affiliated with HHC in any way.  Federico Decl. at ¶ 25.  In fact, it is a competing creditor.  Moreover, HHC did not share any fees with Signet.  *Id*. at ¶ 27.  Rather, by Mr. Caruso's own admission, he knew Defendant Chait through financing that Chait, working for Signet, arranged with EBF Holdings, LLC weeks earlier.  Caruso Decl. at ¶ 5.  While Mr. Caruso's Complaint repeatedly alleges a "conspiracy" among HHC, Madison and Signet, he provides no specific factual allegations or evidence to support these claims.  The only link in the record is to Caruso's purposeful defaults under various MCA Agreements followed by his filing of this meritless "RICO" action to attempt to cement his company's windfall.

///

///

## ARGUMENT

**A.    The Forum Selection Clause in the Merchant Agreement requires transfer to the <u>Southern District of New York</u>.**

As this Court recently affirmed in *Howard v. Snap Inc.*, 2024 U.S. Dist. LEXIS 210615, 2024 WL 4839751 (D. Nev. Nov. 19, 2024): "'Forum selection clauses are considered prima facie valid.' *Fouad on behalf of Digital Soula Sys. v. State of Qatar*, 846 F. App'x 466, 469 (9th Cir. 2021). They should be 'given controlling weight in all but the most exceptional cases.' *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 59-60, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013) (citation omitted) ...." *Accord SmarterSwipe, Inc. v. Navarrete*, 2024 U.S. Dist. LEXIS 198690, 2024 WL 5007294 (D. Nev. Oct. 31, 2024) (quoting *Atlantic Marine* for the proposition that selection clauses "represent the parties' agreement as to the most proper forum" and, having been bargained for by the parties, "protects their legitimate expectations and furthers vital interests of the justice system.").

Section 37 of the Merchant Agreement provides:

> Any litigation relating to this Agreement, whether sounding in contract, tort, law, equity, or otherwise, involving HHC on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the State of New York (the 'Acceptable Forums'). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

Federico Decl. at Ex. A, p. 9.

As this clause so-states, it is both broad and mandatory, requiring litigation in New York of "any litigation relating to this Agreement." *See Sun v. Advanced China Healthcare Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) ("[F]orum-selection clauses covering disputes 'relating to' a particular agreement apply to any disputes that reference the agreement or have some 'logical or

1   causal connection' to the agreement." [internal citations omitted]).

2          In his pro se Complaint, Plaintiff alleges that the Merchant Agreement is a usurious loan

3   and that HHC somehow committed fraud by offering $140,000 in financing under the Merchant

4   Agreement but only providing $32,000 in such financing.  Plaintiff identifies no alleged "fraud"

5   or misconduct outside of the four corners of the agreement, which, as is detailed above, establish,

6   as a matter of law, that the transaction was neither a "loan" nor an unconditional guaranty of

7   $140,000 in financing.  The merits notwithstanding, this dispute is clearly covered by the New

8   York forum selection clause in the contract as it "relates" to the Merchant Agreement.

9   Accordingly, the Court should reject Plaintiff's attempt at forum shopping and transfer this action

10  to the proper forum for consideration of Plaintiff's motion for injunctive relief and adjudication of

11  the Complaint.

12  **B.      Plaintiff has not established any of the elements required for a TRO.**

13         Assuming, *arguendo*, that venue is proper in this District, Plaintiff's request for a TRO

14  should nevertheless be denied.  It is well settled that a temporary restraining order is intended to

15  preserve the *status quo* and to prevent irreparable harm "just so long as is necessary to hold a

16  hearing, and no longer."  *Granny-Good Foods, Inc. v. Bhd. Of Teamsters*, 415 U.S. 423, 439

17  (1974).  The standard governing the issuing of a TRO is "substantially identical" to the standard

18  for issuing a preliminary injunction.  *Stuhlbarg Int'l Co. v. John D. Brush & Co.*, 240 F.3d 832,

19  839 n. 7 (9th Cir. 2001).  To obtain either form of injunctive relief, the moving party must show:

20  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party

21  in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving

22  party; and (4) that an injunction is in the public's interest.  *Winter v. Nat. Res. Def. Council, Inc.*,

23  555 U.S. 7, 20 (2008).  Injunctive relief is "an extraordinary remedy that may only be awarded

24  upon a clear showing that plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

KAEMPFER
CROWELL

"The Ninth Circuit makes clear that a showing of immediate irreparable harm is essential for prevailing on a temporary restraining order." *Juarez v. Asher*, 556 F. Supp.3d 1181, 1191 (W.D. Wash. 2021) (citing *Carribean Marine Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Carribean Marine Servs.*, 844 F.2d at 674.  "Subjective apprehensions and unsupported predictions . . . are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm." *Id*. at 675-76.  Purely economic harm is generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation. *Idaho v. Couer D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (citing *Sampson v. Murray*, 415 U.S. 61, 61-2 (1974)).

Plaintiff miserably fails to meet his burden of establishing the most important element of a request for a TRO – irreparable harm pending a preliminary injunction hearing.  First and foremost, Plaintiff seeks to restrain HHC from "initiating or continuing any collection efforts related to the [Merchant Agreement] or enforcing any UCC liens or notices of assignment" but has not included Emjai, the actual seller, as a party to this action.  Plaintiff, an individual defendant, simply has no standing to assert potential harm to a non-party, particularly as to the use of contractually authorized UCC liens aimed at collateral provided by Emjai, a business entity that is not seeking injunctive relief.

Nor has Plaintiff demonstrated any "irreparable" harm even as to Emjai.  Vague references to financial difficulties are insufficient as a matter of law.  There is no supporting documentation in the motion speaking to revenues, liabilities, or any harm other than the attachment of a lien notices served on May 13, 2025, which purportedly led to a freeze of several thousand dollars.  More to the point, Plaintiff has made no showing that HHC's attempt to enforce a $38,000 judgment will cause Emjai, a company with $850,000 in annual revenues, "irreparable harm"

KAEMPFER
CROWELL

pending an imminent hearing on Plaintiff's request for a preliminary injunction.

Notably, Plaintiff waited weeks after HHC commenced suit in New York to improperly seek a TRO in this Court. By now, HHC has already obtained a judgment against Emjai and Caruso, rendering the aspect of Plaintiff's TRO seeking to essentially stay ongoing state court proceedings moot and improper based on principles of comity and *Rooker-Feldman*. The record establishes a valid debt owed to HHC and concomitant rights to enforce that debt through New York statutory post-judgment remedies and UCC secured party rights.

The balance of equities also does not favor Plaintiff. HHC fully performed under the Merchant Agreement, leading to a windfall for Emjai after it purposefully breached the agreement. Plaintiff then elected to ignore HHC's New York breach of contract action, leading to entry of a judgment in HHC's favor. The granting of a TRO under such circumstances would effectively be rewarding forum shopping and gamesmanship by a savvy individual who is well-versed in manipulating this type of commercial financing.

Finally, Plaintiff has no likelihood of success on the merits. Plaintiff repeatedly invokes sharp conclusory allegations such as "extortion" and "fraud" without supporting facts or evidence. The offer of financing is set forth in the Merchant Agreement, which makes clear that weekly disbursements could be terminated in the event of Emjai's breach. That is precisely what occurred, leading HHC to exercise its contractual rights through UCC lien notices and commencement of a breach of contract action on notice to Emjai and Caruso.

Moreover, Plaintiff alleges that the Merchant Agreement is "usurious," but fails to identify any Nevada statute establishing the usury rates for this type of transaction (if any exist). Plaintiff's citation to New York law is wholly inaccurate and unavailing as courts do not consider HHC's merchant agreements to be loans under New York law. *See, e.g.*, *Highland Hill Capital LLC v. Muse Extension Lounge LLC*, 2024 N.Y. Misc. LEXIS 4696, 2024 N.Y. Slip Op 31766(U) (Sup.

KAEMPFER
CROWELL

Ct. Kings Cnty. May 14, 2024) (HHC agreements were not loans); *Highland Hill Capital, LLC v. D&D Truck Access, LLC*, 2024 N.Y. Misc. LEXIS 25808 (Sup. Ct. Kings Cnty. Apr. 25, 2024) (same); *Highland Hill Capital, LLC v. Southern Crescent Medical Clinic, Inc.*, Index No. 57490/2025 (Sup. Ct. West. Cnty. June 2, 2025) (dismissing usury claim as a matter of law), copies of which are annexed to the accompanying Federico Decl. at Exs. H through J.

Plaintiff's reference to attorney general pleadings against unrelated MCA companies notwithstanding, New York continues to view similarly structured MCA agreements as contingent sales of future business receipts, not loans requiring guaranteed repayment of principal. *Revenued LLC v. LD & W LLC*, 2024 N.Y. Misc. LEXIS 1352 at * 5 (Sup. Ct. Nass. Co. Mar. 25, 2024) ("A merchant cash advance agreement is not a loan and therefore its terms are not usurious."). *Accord Reserve Funding Grp. v. Cal. Organic Fertilizers*, 2024 U.S. Dist. LEXIS 67438, 2024 WL 1604195 (E.D.N.Y. Apr. 12, 2024); *Pearl Delta Funding, LLC v. Ill. Collection Serv., Inc.*, 2023 U.S. Dist. LEXIS 206803, 2023 WL 8003336 (E.D.N.Y. Nov. 17, 2023); *Streamlined Consultants Inc. v. EBF Holdings LLC*, 2022 U.S. Dist. LEXIS 171085, 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022); *Mazzoni Ctr. v. LCF Grp., Inc.*, 2024 U.S. Dist. LEXIS 208591, 2024 WL 4821475 (E.D. Pa. Nov. 18, 2024) (holding that MCA agreements were not loans under New York law and denying merchant's motion for TRO). These holdings make clear that the use of initial estimated payments, and the inclusion of a personal guaranty or security interest in the seller's future receivables does not change the analysis.

Indeed, the New York appellate courts only recently confirmed that MCA agreements remain subject to the same test to determine if they are loans or purchases. *See True Bus. Funding, LLC v. Guerrero A Const. Corp.*, ____ A.D.3d ____, 2025 N.Y. App. Div. LEXIS 3637 (2nd Dept. June 11, 2025). That test examines whether "a principal sum advanced is repayable absolutely" through three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether

the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Id*. at * 3-4.

HHC's Merchant Agreement includes a mandatory reconciliation provision (Section 4), does not have a finite term (Section 7) and expressly states that bankruptcy is not an event of default (Section 15). It is a commonly used form of financing agreement and wholly analogous to the agreement that the appellate court held in *True Business Funding* was not usurious, as a matter of law. *Id*.[1] It is also not "unconscionable," either procedurally or substantively. The Court's holding in *Capytal.com v. First Priority Sec. LLC*, 2024 N.Y. Misc. LEXIS 2298 (Sup. Ct. Rock. Cty. May 23, 2024) is equally applicable here:

> The Agreement is not a sale for goods but for future receivables. Defendants are not commercially illiterate consumers. In fact, according to Defendants *it entered the Agreement as a means to consolidate a previous agreement, having knowledge of the contract terms, obligations and dealings with Plaintiff.* Defendants can hardly enter into a second Agreement claiming ignorance. While Defendants proffer that the terms are oppressive, and that underwriting process was unjust, it was Defendants choice to enter into further agreement with Plaintiff. Defendants submit no evidence to substantiate any claims that Plaintiff engaged in high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract or an imbalance in the understanding and acumen of the parties. Defendants make conclusory and unsubstantiated allegations. Even to the extent that Defendants argue that the contractual provisions include inflated prices or unfair consequential damages, it cannot use a claim of unconscionability as a means to readjust the agreed allocation of the risks or insinuate that there is an imbalance in the parties' bargaining power. ([Emphasis added]).

---

[1]    In full, the appellate court held: "Here, the plaintiff established, *prima facie*, that the agreement contained a clause that provided that the LLC could request reconciliation to adjust payments upward or downward in response to fluctuations in the LLC's weekly receipts (*see id.*). The plaintiff further established, prima facie, that this clause rendered the term of the agreement indefinite (*see id.*). Additionally, the agreement identified bankruptcy as a 'valid excuse' from the LLC's performance, which would not constitute default. Since bankruptcy relieved the LLC of the obligation of repayment, the plaintiff's entitlement to repayment was not absolute (cf. LG Funding, LLC v United Senior Props. of Olathe, LLC, 181 AD3d at 666). Similarly, bankruptcy did not entitle the plaintiff to invoke Guerrero's personal guaranty (*cf. id.*).". Taken together, these factors satisfied the plaintiff's prima facie burden of demonstrating that the transaction at issue was a purchase of future receivables and not a criminally usurious loan."

*Id.,* 2024 N.Y. Misc. LEXIS 2298 at * 16-17.

Plaintiff's reliance on *Crystal Springs Capital v. Big Thicket Coin, LLC*, 220 A.D.3d 745 (2d Dept. 2023), is misplaced.  As the court expressly noted in that case, the financing agreement provided that "plaintiff was 'under no obligation' to reconcile the payments to a percentage amount of the Big Thicket defendants' sales rather than the fixed daily amount, and the plaintiff was entitled to collect the full uncollected purchase amount plus all fees due under the agreement in the event of the Big Thicket defendants' default by … declaring bankruptcy." *Id*. at 747.  None of these terms are present in HHC's agreements.  Rather, HHC's reconciliation provision is mandatory, and bankruptcy is not an event of default.  *Muse Extension*, *supra*, 2024 N.Y. Misc. LEXIS 4696 at * 7.  Nor does Mr. Caruso allege that Emjai ever qualified for a reconciliation, let alone that one was denied by HHC.  In short, HHC's agreements are not loans.

## **CONCLUSION**

For the foregoing reasons, the HHC Defendants respectfully request that this action be transferred to the Southern District of New York and that Plaintiff's motion be denied.

DATED: June 13, 2025

KAEMPFER CROWELL

By: _____
Louis M. Bubala III, No. 8974
Isabella Goldsmith, No. 16870

*Attorneys for Defendants Highland Hill Capital, LLC Andrew Versace, Scott Federico, and Tristan Bloom*

KAEMPFER
CROWELL

**INDEX OF EXHIBITS**

| Exhibit | Description | Pages/Bates |
|---|---|---|
| 1 | Declaration of Scott Federico | 1–8 |
| A | Merchant Agreement | Exhibit A001–022 |
| B | Weekly Disbursement Addendum | Exhibit B001–004 |
| C | HHC Weekly Payments to Emjai | 1–2 |
| D | Emjai Initial Remittances to HHC | 1 |
| E | New ACH Authorization for Reduced Remittances to HHC | 1 |
| F | Emjai Default on Reduced Remittances | 1–2 |
| G | New York Judgment Against Emjai LLC and Caruso | Exhibit G001–026 |
| H | HHC v. Muse Extension Lounge, 2024 NY Misc. Lexis 4696 | Exhibit H001–004 |
| I | HHC v. D&D Truck Access, 2024 NY Misc. Lexis 25808 | 1–3 |
| J | HHC v. Southern Crescent Index No. 57490/2025 (N.Y.) | Exhibit J001–007 |

KAEMPFER
CROWELL

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of Kaempfer Crowell, that I am over the age of 18 and not a party to the above-referenced case.  I further certify that on Friday, June 13, 2025, the following document was filed and served as indicated below.

**OPPOSOTION TO:--MOTION FOR TEMPORARY RESTRAINING ORDER [DKT. 6] AND --MOTION FOR PRELIMINARY INJNCTION [DKT. 7]; AND CROSS-MOTION TO DISMISS FOR IMPROPER VENUE**

**___    BY NOTICE OF ELECTRONIC FILING** through Electronic Case Filing System of the United States District Court for the District of Nevad, to the individuals and/or entities at their email addresses as set forth below:

 X    **BY ELECTRONIC MAIL**, based upon this Court's order to the parties to accept service by email, to the individuals and/or entities at their addresses as set forth below:

 Marcus Caruso, emjaillc@gmail.com

 X    **BY U.S. MAIL**: first class postage prepaid, to the individuals and/or entities at their addresses as set forth below:

Marcus Caruso
708 Nevada Way
Boulder City, NV 89005

I declare under the penalty of perjury that the foregoing is true and correct.

DATED Friday, June 13, 2025

/s/ *Bonnie Jacobs*
_____
Bonnie Jacobs
An employee of Kaempfer Crowell

KAEMPFER

CROWELL